The document below is hereby signed.

Signed: April 28, 2020



_S. Martin Teel Jr._
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

In re                          )
                               )
NETtel CORPORATION, and        )   Case No. 00-01771
NETtel COMMUNICATIONS, INC.,   )   (Chapter 7)
                               )   (Joint Administration)
              Debtors.         )

## MEMORANDUM DECISION AND ORDER DENYING
## TRUSTEE'S MOTION TO ALTER OR AMEND JUDGMENT

Wendell W. Webster is the trustee of the estates of the debtors in these jointly administered cases under Chapter 7 of the Bankruptcy Code (11 U.S.C.).  Estate funds remaining on hand are not sufficient to pay in full the fees owed the United States Trustee[1] under chapter 123 of title 28 and the unpaid administrative claims incurred under 11 U.S.C. § 503(b) in these cases after they were converted to Chapter 7.  Those unpaid administrative claims are the remaining claims of Webster; his law firm; his accountant (Arthur Lander C.P.A., LLC ("Lander")); and The Hartford Fire and Insurance Company ("The Hartford") (for

---

[1]  The United States Trustee is appointed under 28 U.S.C. § 586 to play a role in the administration of bankruptcy cases.

The Hartford's right to indemnification with respect to lease
payments The Hartford made pursuant to a Lease Guaranty Bond
respecting a lease of the debtors).  Administrative claims and
the U.S. Trustee's fee claims are entitled under what is now 11
U.S.C. § 507(a)(2) to priority over other unsecured claims in
these cases.  In turn, 11 U.S.C. § 726(b) requires pro rata
distribution on such claims.  Section 726(b) provides in relevant
part:

> Payment of claims of a kind specified in paragraph . . .
> (2) of section 507(a) of this title . . . shall be made
> pro rata among claims of the kind specified in each such
> particular paragraph, except that in a case that has been
> converted to this chapter under section 1112 . . . of
> this title, a claim allowed under section 503(b) of this
> title incurred under this chapter after such conversion
> has priority over a claim allowed under section 503(b) of
> this title incurred under any other chapter of this title
> . . . .

The U.S. Trustee's fee claims arose under chapter 123 of title 28
and are not treated as administrative claims under 11 U.S.C.
§ 503(b).  They were incurred while the cases were in Chapter 11.
However, because they were not administrative claims, 11 U.S.C.
§ 726(b) does not render them junior in priority to the
administrative claims incurred in the Chapter 7 case.  *See In re
MCO Wash, Inc.*, 555 B.R. 159, 164 (Bankr. E.D.N.Y. 2016) ("Any
unpaid UST quarterly fees, which are assessed under chapter 123
of title 28, are not subordinated despite being incurred
pre-conversion . . . .").

In a *Memorandum Decision and Order Re the Pro Rata Distribution of the Debtor's Estate* ("*Memorandum Decision*") (Dkt. No. 1324), I ordered Webster and his law firm to make a partial disgorgement of payments that had been made to them on their administrative claims in order to assure that there was a pro rata distribution under 11 U.S.C. § 726(b) on the U.S. Trustee's fee claim and the Chapter 7 administrative claims of Webster, his law firm, Lander, and The Hartford.  In his *Trustee's Motion to Alter or Amend Judgment* ("*Motion to Alter*") (Dkt. No. 1327), Webster requests that the court reconsider the *Memorandum Decision*.  For the reasons that follow, I will deny the *Motion to Alter*.

I

THE STANDARDS APPLICABLE TO A RULE 59 MOTION

Under Fed. R. Civ. P. 59(e), made applicable to bankruptcy by Fed. R. Bankr. P. 9023, a court may alter or amend a judgment if the "court finds that there is an intervening change of controlling law, the availability of new evidence, or to correct a clear legal error or prevent manifest injustice."  *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996).  Such motions "are disfavored and relief from judgment is granted only when the moving party establishes extraordinary circumstances."  *Niedermeier v. Office of Baucus*, 153 F. Supp. 2d 23, 28 (D.D.C. 2001).  Moreover, a "Rule 59(e) motion is not a second

3

opportunity to present argument[s] upon which the Court has already ruled, nor is it a means to bring before the Court theories or arguments that could have been advanced earlier." *W.C. & A.N. Miller Co.'s v. United States*, 173 F.R.D. 1, 3 (D.D.C. 1997).

Webster does not show any change in the controlling law, the availability of new evidence, the need to correct a clear error, or the need to prevent manifest injustice to warrant altering or amending the *Memorandum Decision*. Webster's arguments are for the most part ones he made previously, albeit in slightly different clothing, and the *Memorandum Decision* already considered and rejected those arguments, and to the extent that there are new arguments, they ought to have been raised previously. As such, the *Motion to Alter* could be denied without reaching the merits. In any event, the arguments fail on the merits to show any error in the *Memorandum Decision*.

II

THE DISTRIBUTIONS ORDERED TO BE DISGORGED,
IF NOT DISGORGED, WOULD VIOLATE THE PRINCIPLE
OF EQUALITY OF DISTRIBUTION MANDATED BY 11 U.S.C. § 726(b)

Without the court's disgorgement order, the disparities in the percentage payment of administrative claims at issue would be extraordinary. Pursuant to prior distributions in the case:

- Webster has received $1,069,252.19 in payment of his administrative claim of $1,083,922.41 (98.65% of that claim);

- Webster's law firm has received $2,554,205.36 of its administrative claim of $2,627,516.60 (97.21% of that claim);

- The Hartford has received $250,000.00 of its administrative claim of $863,169.62 (28.96% of that claim);

- the U.S. Trustee has received no payment of its $500.00 fee claim (0% of that claim); and

- Lander has received $37,051.83 of his administrative claim of $59,685.00 (62.08% of that claim).

The *Memorandum Decision* directed Webster and his law firm to make a partial disgorgement of the amounts they had received so that Webster, his law firm, The Hartford, Lander, and the U.S. Trustee will all have received the same percentage payment of their claims, consistent with the command of § 726(b) that payment on their claims "shall be made pro rata."

As under the Bankruptcy Act, equality of distribution is a bedrock principle of the Bankruptcy Code. In *Nathanson v. N. L. R. B.,* 344 U.S. 25, 29 (1952), the Court stated:

> The theme of the Bankruptcy Act is "equality of distribution," *Sampsell v. Imperial Paper & Color Corp.,* 313 U.S. 215, 219, 61 S.Ct. 904, 907, 85 L.Ed. 1293

> [(1941)]; and if one claimant is to be preferred over
> others, the purpose should be clear from the statute.

This principle continues under the Bankruptcy Code.  *See Howard
Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 655
(2006) (noting that "preferential treatment of a class of
creditors is in order only when clearly authorized by Congress");
*Begier v. Internal Revenue Service*, 496 U.S. 53, 58 (1990)
("Equality of distribution among creditors is a central policy of
the Bankruptcy Code.  According to that policy, creditors of
equal priority should receive pro rata shares of the debtor's
property."); *Bentley v. Boyajian (In re Bentley)*, 266 B.R. 229,
240 (B.A.P. 1st Cir. 2001) ("The principle of equality of
distribution has been carried forward as one of the guiding
principles of the Bankruptcy Code.")

As recently as 2017, the Supreme Court upheld the principle
that a bankruptcy court may not, "without the consent of the
affected parties, deviate from the basic priority rules that
apply under the primary mechanisms the Code establishes for final
distributions of estate value in business bankruptcies."
*Czyzewski v. Jevic Holding Corp.*, ___ U.S. ____, ___, 137 S.Ct.
973, 978, 197 L.Ed.2d 398 (2017).  The Court noted that unlike
first-day wage orders or critical vendor payments, a final
distribution that varies from the Bankruptcy Code's priority
scheme does not preserve the estate as a going concern; make the
disfavored creditors better off; promote the possibility of a

6

confirmed plan; restore the *status quo ante*; or protect reliance interests. *Id.* at 986. Notably, all of the funds in the proposed distribution in *Jevic*, like the funds in this case, were the cash collateral of one or more secured creditors. *Id.* at 981. Yet the Court still disapproved the proposed distributions that were at variance with the Bankruptcy Code's priority scheme, noting that "in Chapter 7 liquidations, priority is an absolute command." *Id.* at 983.

To paraphrase *Jevic*, 137 S.Ct. at 986, Webster has not identified "any significant offsetting bankruptcy-related justification" that would warrant violating "the ordinary priority rules" applicable here under § 726(b). Webster and his law firm have failed to show that disregard of the priority scheme will promote "a significant Code-related objective," *Jevic*, 137 S.Ct. at 985,[2] such as so-called "first-day" wage orders "permitting a business debtor to reorganize and restructure its debt in order to revive the business and maximize the value of the estate." *In re Fryar*, 570 B.R. 602, 609-10

---

[2] The Court also found that the Bankruptcy Code bars approval of a settlement "attached to a final disposition" of bankruptcy estate assets because such distributions do not have "any significant offsetting bankruptcy related justifications" for violating the priority scheme. *Id.* at 985-86. The Court noted that unlike first day wage orders or critical vendor payments, final distributions do not preserve the estate as a going concern, make the disfavored creditors better off, promote the possibility of a confirmed plan, restore the status quo ante, or protect reliance interests. *Id.*

(Bankr. E.D. Tenn. 2017) (disapproving a settlement violating the Code's priority scheme in a case in which funds to pay creditors would have to come from the liquidation of assets, not reorganization).

"Creditors within a given class are to be treated equally, and bankruptcy courts may not create their own rules of superpriority within a single class." *Matter of Saybrook Mfg. Co., Inc.*, 963 F.2d 1490, 1496 (11th Cir. 1992). "Had Congress wanted the bankruptcy courts to fashion their own priorities for distribution of assets, it might have omitted Sections 364, 507, and 726 from the Code. Instead, the Bankruptcy Reform Act of 1978, as each of its more recent predecessors, contained an elaborate scheme of priorities. The Court does not have the prerogative to flout those priorities." *In re IML Freight, Inc.*, 52 B.R. 124, 137 (Bankr. D. Utah 1985). *See also In re Chambers*, 500 B.R. 221, 227 (Bankr. N.D. Ga. 2013) ("The statutory priority scheme is mandatory; Congress did not authorize the courts to exercise discretion and bankruptcy courts may not create priorities within classes."). In this case, nothing in the Bankruptcy Code alters the rule that administrative claims incurred in the Chapter 7 case and United States Trustee quarterly fees are entitled to equality of distribution as directed by 11 U.S.C. § 726(b). In allowing for interim payments of compensation to a trustee or the trustee's professionals, 11

U.S.C. § 331 does not alter the requirement of equality of distribution embodied in § 726(b) and does not give a preference to those who received interim distributions.

Webster in effect proposes a subordination of the claims of the United States Trustee and The Hartford to a lower priority than the amounts received by him and his law firm by way of interim distributions under § 331.  Even if he believes that such subordination would be equitable, the Bankruptcy Code does not authorize equitable subordination (addressed by 11 U.S.C. § 510(c)) of administrative claims of the same rank of distribution under § 726(b) on that basis.  *See United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 229 (1996) (holding that "categorical reordering of priorities that takes place at the legislative level of consideration is beyond the scope of judicial authority to order equitable subordination under § 510(c).").

III

FACTS

NETtel Corporation, Inc. was engaged in the business of providing business data communication services, and acted as the operating subsidiary of NETtel Communications, Inc., its sole shareholder.  Both corporations filed petitions commencing cases under Chapter 11 of the Bankruptcy Code.  NETtel Corporation, Inc.'s case is Case No. 00-01771, commenced on September 28,

9

2000, and NETtel Communications, Inc.'s case is Case No. 00-01872, commenced on October 16, 2000.  By an order of November 8, 2000, the cases have been jointly administered (but not substantively consolidated) under Fed. R. Bankr. P. 1015(b), and filings since then have been made in Case No. 00-01771.  Because it will not affect the analysis of the disgorgement issues, and for ease of discussion, I will refer to the two debtors as "NETtel" as though they were one entity and will often refer to their cases as though the cases were a single case.

Nortel Networks, Inc., Allied Capital Corporation, and Williams Communications, Inc. (the "Secured Creditors") were the debtors' principal secured lenders.  Nortel Networks, Inc. acted as administrative agent for the Secured Creditors.  The Secured Creditors asserted liens against substantially all of the debtors' assets, including all cash and proceeds of non-cash assets.  They even claimed that recoveries Webster made pursuant to 11 U.S.C. § 550(a), regarding transfers avoided pursuant to avoidance powers specified in § 550(a), were their cash collateral because they were entitled to replacement liens on such recoveries to the extent that their other cash collateral was depleted in the case.  The NETtel cases stayed in Chapter 11 for less than a month.

On October 23, 2000, the court converted the two cases to cases under Chapter 7 of the Bankruptcy Code.  On October 24,

2000, Webster was appointed as the Chapter 7 trustee for both
cases.

During the pendency of the cases in Chapter 11, NETtel, as a
debtor in possession under 11 U.S.C. § 1101, had pursuant to 11
U.S.C. § 1107(a) the powers of a trustee.  Under 11 U.S.C.
§ 363(c)(1), it was authorized to use property of the estate in
the ordinary course of business without notice or hearing,
including paying postpetition obligations incurred to keep
NETtel's business running.  However, under 11 U.S.C. § 363(c)(2),
use of estate property that is a secured creditor's cash
collateral pursuant to § 363(c)(1) requires the secured
creditor's consent or a court order.

Interim compensation to a trustee or professionals under 11
U.S.C. § 331 is not treated as an expense incurred in the
ordinary course of business, so § 363(c)(1) does not apply to
such interim compensation: an order allowing such compensation
must be obtained.  Once such an order is obtained allowing
compensation, 11 U.S.C. § 363(c)(2) requires that use of estate
property that is a secured creditor's cash collateral to pay the
allowed compensation be only pursuant to the secured creditor's
consent or a court order.

A trustee (or debtor-in-possession) can invoke 11 U.S.C.
§ 506(c) to recover from the secured creditor's collateral "the
reasonable, necessary costs and expenses of preserving, or

disposing of, such property to the extent of any benefit to" the

secured creditor.  Recognizing this, a secured creditor often

enters into an agreement to permit the trustee (or debtor-in-

possession) to use cash collateral for paying expenses

benefitting the secured creditor.

Under 11 U.S.C. § 363(a), cash collateral includes a

bankruptcy estate's cash and cash equivalents, including proceeds

of property subject to a security interest.  When its case began,

NETtel attempted to continue its business operations, but the

Secured Creditors asserted liens upon substantially all of its

assets, including all cash and proceeds of non-cash assets, thus

presenting issues regarding the use of cash collateral.[3]  As of

the petition date, the Secured Creditors were owed, in the

aggregate, approximately $92,000,000.  If such liens existed as

claimed by the Secured Creditors, NETtel was required under 11

U.S.C. § 363(c)(2) to obtain court authorization for the use of

such cash collateral.

On October 11, 2000, NETtel filed an emergency motion to use

cash collateral, and the court held a hearing on the motion on

October 13, 2000, and thereafter, on October 18, 2000, the court

entered an *Interim Agreement and Consent Order Authorizing Debtor

to Use Cash Collateral and Granting Adequate Protection* (Dkt. No.

---

[3]  As of the petition date, the Secured Creditors were owed,
in the aggregate, approximately $92,000,000, exclusive of
interest and other expenses.

12

50) ("*Interim Cash Collateral Order*"), which remained effective
after the case was converted to Chapter 7.[4]  The *Interim Cash
Collateral Order* authorized NETtel's emergency use of the Secured
Creditors' cash collateral (including proceeds of other
collateral), pursuant to an agreed budget, to fund critical
business operations.  Specifically, the *Interim Cash Collateral
Order* was designed to allow NETtel to continue its business
operations and to preserve the value of its assets and the
collateral securing the Secured Creditors as of the petition
date.  The use of cash collateral was, pursuant to the *Interim
Cash Collateral Order*, subject to the various provisions designed
to provide protection to the Secured Creditors, including a
budget through January 5, 2001, regarding the use of cash
collateral, and the granting to the Secured Creditors of
replacement liens on all of NETtel's assets, including any
recoveries that might eventually be made under Chapter 5 of the
Bankruptcy Code (including preference actions) to the extent
necessary to replace prepetition collateral used by NETtel.

Many of NETtel's suppliers were providing telephonic or
internet services, and were arguably entitled to the protections
of 11 U.S.C. § 366 regarding deposits and other protections

---

[4]  *See* Adversary Proceeding No. 05-10077 (Dkt. No. 44)
(*Memorandum Decision and Order re Nortel Network's Motion for
Partial Summary Judgment* dated Apr. 30, 2008, and entered May 1,
2008)) at 15-20.

accorded to utilities providing services.  The largest item on
the budget was "Telecom Vendor Payments" aggregating $8,347,875
over the life of the agreed budget.  NETtel also had various
leases and executory contracts.  The lessors and parties to
executory contracts were entitled to special protections under 11
U.S.C. § 365 (including protections regarding paying rent under
leases of commercial real estate and protections regarding the
assumption and assignment of leases and executory contracts).
The agreed budget included, for example, substantial payments by
NETtel to telecom vendors and lessors, and substantial employee
compensation expenses.  These budgeted items to be paid from cash
collateral under the agreed budget were expenses that under
§ 363(c)(1) could be paid in the ordinary course of business
without the necessity of a court order.

Once the case was converted to Chapter 7, and upon Webster's
obtaining authority under 11 U.S.C. § 721 to operate NETtel's
business, Webster was similarly authorized under § 363(c)(1) to
use property of the estate in the ordinary course of business,
subject to the restrictions of § 363(c)(2) regarding the use of
cash collateral.

Webster employed his law firm, Webster & Fredrickson, PLLC
(Webster, Fredrickson, Correia & Puth at that time) to represent
him as trustee, and filed an application on November 1, 2000, to
approve his employment of the law firm under 11 U.S.C. § 327.  On

14

November 28, 2000, the court granted that application.  Webster
was not authorized under 11 U.S.C. § 363(c)(1) (dealing with use
of property in the ordinary course of business) to use estate
property to compensate his law firm for services and to reimburse
its expenses.  Instead, as a professional employed under 11
U.S.C. § 327, the law firm could receive compensation and
reimbursement of expenses only pursuant to a court order, either
on an interim basis under 11 U.S.C. § 331 or on a final basis
under 11 U.S.C. § 330.  The same applied as well to compensation
of Webster himself and reimbursement of his expenses.  Of course,
payment of such court-approved amounts out of cash collateral
would require consent of the Secured Creditors or a court order.

On November 3, 2000, Webster filed an emergency motion to
operate NETtel's business.  On November 9 and 13, 2000, the court
held hearings to address the emergency motion and various related
matters concerning requests of service providers and licensors
for assurance that they would be paid on a going forward basis
for services they provided.  On November 13, 2000, the court
entered an *Order Authorizing Trustee to Operate Debtor's Business*
(Dkt. No. 140) authorizing Webster, as the trustee, to continue
operating NETtel's business for 60 days, beginning *nunc pro tunc*
as of November 3, 2000, under a business plan to maximize and
retain business value.  The *Order* included an agreed budget of
expenditures Webster was authorized to make that was largely

15

similar to the budget under the cash collateral order that NETtel

Corporation, Inc. obtained, and authorized Webster to make

periodic payments of expenses for goods and services in advance

but subject to a "true-up" verifying the actual correct amount of

each such expense.  The *Order* made no mention of Webster or his

law firm's being assigned the Secured Creditors' cash collateral

to secure payment for their services in the case.

Webster determined that pending a sale of NETtel's assets,

it would not be cost effective to continue to operate NETtel's

business, and on or about December 15, 2000, he ceased operation

of NETtel's business.[5]

On April 27, 2001, the court entered an order (Dkt. No. 524)

authorizing Webster to sell substantially all of the Debtors'

operating assets, including various leases and executory

contracts, free and clear of all liens, to McLeodUSA Incorporated

("McLeod") for $21,500,000.[6]  Webster completed the closing on

the McLeod sale on May 4, 2001.  Upon closing, Webster was

required to escrow the total amount of $2,400,000 from the sales

proceeds to cover the amounts necessary to cure and compensate

entities for any defaults under the leases and executory

---

[5] See *Consent Motion Filed By Trustee Wendell W. Webster, Creditor Allied Capital Corporation, Creditor Williams Communication, Inc., Creditor Nortel Networks, Inc. to Approve Trustee's Use of Cash Collateral* (Dkt. No. 772) at ¶ 5.

[6] The purchase price appears in the Asset Purchase Agreement (Dkt. No. 523) at § 1.3.

16

contracts assigned in connection with the sale.  Webster received net sales proceeds in the amount of $19,218,000.00. Webster was required to hold the sales proceeds pending further order of the court.[7]

On November 16, 2001, Webster's law firm filed its *First Application* (Dkt. No. 709) for compensation and reimbursement of expenses[8] and Webster filed a *Motion to Approve Interim Disbursement of Sales Proceeds and Establish Procedure for the Resolution of Disputed Administrative Claims* (Dkt. No. 713).  In the *Motion*, Webster noted the sales and collections he had made. (At that point, Webster had not collected any proceeds via preference actions under 11 U.S.C. §§ 547 and 550.)  In the *Motion* (at 4-5), Webster noted that beyond expenses incurred during the period he operated NETtel's business, a number of other parties had filed claims provided both during Chapter 11 and Chapter 7, with the timely filed claims for administrative expenses totaling approximately $6,000,000.  The *Motion* (at 4-5) stated:

> The Secured Creditors have objected to the payment of any
> portion of these claims from the proceeds from the sale

---

[7]   Webster also collected $1,257,511.40 in proceeds via sales of other assets and recovery of security deposits the debtor had made.  *See* Dkt. No. 713 at 3.  Webster was required to hold these proceeds subject to any liens that had been on the assets.

[8]   The court granted the *First Application* on December 11, 2001 (Dkt. No. 727).

17

> of the Debtors' assets. Notwithstanding the objections
> of the Secured Creditors, many of these claimants have
> asserted the right to payment of their claims from
> secured collateral pursuant to 11 U.S.C. § 506(c).
> However, bankruptcy law is clear that the Trustee alone
> has standing to prosecute claims under 11 U.S.C.
> § 506(c). *See Hartford Underwriters Ins. Co. v. Union
> Planters Bank*, 530 U.S. 1 (2000).

Webster then stated "the Trustee proposes to escrow a portion of

the sales proceeds sufficient to cover timely filed

administrative claims, pending the resolution of all claims

asserted pursuant to section 506(c), and to disburse the balance

of the sales proceeds to the Secured Creditors." The proposed

escrow amounts included amounts for Webster's future compensation

claims, and claims of his attorneys for fees and expenses.

*Motion* at 5.

Webster's *Motion* proposed an interim distribution to the

Secured Creditors and interim payments to himself as trustee and

to his law firm, stating:

> The Secured Creditors have consented to payment of the
> Trustee's compensation and attorneys' fees and expenses,
> as a surcharge against the Secured Creditors' collateral,
> for compensation and attorneys' fees and expenses for
> services rendered through April 30, 2001. The Trustee's
> compensation shall be based upon a flat 3% fee on the
> proceeds from the sales to McLeod, Epoch, Cambrian and
> ICC, plus the security deposits and accounts receivables
> collected as of April 30, 2001. The Trustee and Secured
> Creditors have agreed further that the total claims for
> Trustee compensation and attorneys' fees and expenses
> shall not exceed $1,187,686.06 for services rendered
> through April 30, 2001. The Trustee shall have the right
> to submit a supplemental claim for compensation and
> attorneys' fees and expenses based upon any cash or cash
> equivalents received or services rendered after April 30,
> 2001. The Secured Creditors have reserved the right to

object to any supplemental claim submitted by the
Trustee.

*Motion* at 6.  In other words, the Secured Creditors were willing

to treat their collateral as subject to a surcharge under 11

U.S.C. § 506(c) for those administrative claims of Webster and

his law firm.  After all, it was Webster's and his law firm's

efforts that were largely responsible for the sales and

collections that had benefitted the Secured Creditors.  In turn,

upon being authorized to surcharge the collateral, Webster had

funds with which to pay the administrative claims giving rise to

the surcharge.

The further administrative claims asserted against the

estate, to the extent allowed, would be costs and expenses

incurred by Webster.  The extent to which such an allowed claim

for costs and expenses would justify a § 506(c) surcharge was

uncertain: that would depend on Webster's being able to show,

with the assistance of the entity holding the claim, that the

entity's services conferred a benefit on the Secured Creditors

and the amount of the benefit.  Accordingly, the *Motion* (at 6-7)

set forth a proposed procedure for Webster's obtaining

information with which Webster could pursue § 506(c) recoveries

by stating:

> 14.  The Trustee also proposes a procedure for the
> consolidation and adjudication of the administrative
> claims for creditors which have asserted the right to a
> surcharge against the Secured Creditors' collateral
> pursuant to 11 U.S.C. § 506(c).  The factual and legal

19

issues relating to a determination of section 506( c)
treatment in these cases are substantially similar, if
not identical, with respect to all claimants seeking
payment of their claims from the proceeds of the sale of
the Debtors' assets. Essentially, the claims are based
upon telecommunications services rendered on behalf of
the Debtors during the Chapter 11 and Chapter 7 phases of
the cases and prior to the sale of the assets. The
factual issues relate to the nature and extent of the
services actually provided. The legal issues relate to
the extent, if any, of the benefit conferred upon the
Secured Creditors by reason of these services. However,
notwithstanding the fact that many of these claimants
have asserted the right to 506(c) treatment, these
claimants have failed to offer any legal analysis in
support of their respective claims.

15. In order to avoid the time and expense of
protracted litigation with respect to each individual
506( c) claim, the Trustee proposes the adoption of a
uniform procedure for the resolution of all 506(c) claims
in these cases. Specifically, the Trustee proposes that
each creditor that has asserted 11 U.S.C. § 506(c) as a
basis for recovery against the collateral of the Secured
Creditors provide to the Trustee a brief outlining the
legal and, if not already provided, factual bases for
recovery of their claims under section 506(c). The
Trustee does not propose that the creditors provide
additional documentation supporting their claims unless
such documentation has not previously been provided.
Such briefs would be due on January 15, 2002. Following
receipt and review of the materials submitted by the
parties, the Trustee will undertake as expeditiously as
possible such consolidated proceeding or proceedings as
may be appropriate in order to secure recovery on behalf
of the creditors against the Secured Creditors'
collateral.

On December 11, 2001, the court entered an *Order Granting
Motion for Interim Disbursement and Proceeds for Resolution of
Disputed Administrative Claims* (Dkt. No. 726) directing that:

the Trustee is hereby authorized to escrow the sum of
$10,361,265.14 from the collateral of [the Secured
Creditors] . . . pending the resolution of the remaining
administrative claims, including resolution of the right,

20

> if any, to payment of any such claim from collateral
> pursuant to 11 U.S.C. § 506(c)[.]

The order further directed that:

> all entities that have asserted 11 U.S.C. § 506(c) as a
> basis for recovery of their administrative claims against
> the collateral of the Secured Creditors shall, not later
> than January 15, 2002, file with this Court and with a
> copy to the Trustee, a brief outlining the legal and, if
> not already provided, factual bases for recovery of such
> claims under 11 U.S.C. § 506(c).

The order further directed Webster to disburse to Nortel

Networks, Inc., as administrative agent for the Secured

Creditors, $10,615,713.99.

On March 5, 2002, the court entered a stipulated order (Dkt.

No. 760) granting The Hartford an allowed Chapter 7

administrative claim in the amount of $863,169.62.  The Hartford

has received only $250,000.00 towards payment of that claim.

On April 23, 2002, Webster and the Secured Creditors filed a

*Consent Motion to Approve Trustee's Use of Cash Collateral* (Dkt.

No. 772), and on May 22, 2002, the court granted the *Consent*

*Motion* in an order (Dkt. No. 782) authorizing Webster's use of

cash collateral in the amount of $840,707.54, covering expenses

incurred by Webster in maintaining and selling NETtel's assets,

and authorizing Webster's use of $250,000 for anticipated

expenses to be incurred in maintaining and selling NETtel's

remaining assets.  The $840,707.54 in expenses already incurred

did not include any attorney's fees incurred by Webster.[9]  The
$250,000 amount included only expenses necessary to preserve and
sell the remaining assets and did not include any attorneys' fees
associated with the administration of the assets.[10]

On April 10, 2003, the court entered an order granting
Webster's law firm's *Second Application* for compensation and
reimbursement of expenses, and authorizing Webster to disburse
the amount sought of $441,429.18 from the proceeds of the sale of
assets to McLeod USA.  This was the last authorized payment of
Webster or his law firm identified as being made from proceeds of
the collateral of the Secured Creditors.

The bulk of the other disbursements to Webster's law firm
(totaling $1,455,158.33) came from the proceeds of avoidance
litigation, principally actions under 11 U.S.C. § 547(b) to avoid
preferences and to recover the amounts of the avoided transfers
pursuant to 11 U.S.C. § 550.  The *Interim Cash Collateral Order*
provided that to the extent that the use of cash collateral was
not fully replaced with postpetition assets of equal value, the

---

[9]  The $840,707.54 consisted of employee compensation,
expenses, and payroll services ($349,572.90); deinstallation
($87,147.93) (not yet paid); insurance ($74,163.70); billing
services ($68,312.900; transportation and storage ($65,296.42);
software licenses ($52,000.00); electric utilities ($38,533.90);
security ($41,320.00); data storage ($30,800.00); administrative
($33,259.79) (of which $6,038.07 had not yet been paid); and
repairs ($300.00).

[10]  *See* Dkt. No. 772 at ¶ 8.

Secured Creditors would have a lien on the proceeds of avoidance litigation. Webster agreed to keep the proceeds in a separate account (the "Preference Settlement Account") pending an order determining the extent to which the funds were held for the benefit of the Secured Creditors pursuant to replacement liens on the proceeds of avoidance action recoveries granted to them by the *Interim Cash Collateral Order*.[11] Eventually, as will be seen, a settlement was reached regarding the extent to which the Secured Creditors received a portion of the Preference Settlement Account and the remainder was received by Webster, on behalf of the estate, free of any asserted lien of the Secured Creditors. Recoveries via avoidance actions had almost reached $4,000,000.00 by the time the settlement was reached. Along the way to that settlement, $1,455,158.33 had been paid to the law firm from the Preference Settlement Account as interim compensation and reimbursement of expenses.[12] In light of the settlement having treated a portion of the Preference Settlement Account as not

---

[11] See *Amended Order Granting Third Application of Webster, Frederickson & Brackshaw for Interim Compensation and Reimbursement of Expenses* (Dkt. No. 936, entered December 19, 2003).

[12] The $1,455,158.33 is derived from various orders (Dkt. Nos. 936, 1011, 1059, 1098, 1114, and 1162). The entirety of the law firm's Third, Fourth, Fifth, Sixth, and Eighth *Applications* for compensation were paid from the Preference Settlement Account. In addition, $72,745.63 of its *Seventh Application* was paid from that Account. As reflected by Dkt. No. 1158, another $105,524.00 of the *Seventh Application* was paid incident to the settlement without a specification of the source.

encumbered by replacement liens for the Secured Creditors, the payments to Webster and his law firm from the Preference Settlement Account were to that extent necessarily not from cash collateral of the Secured Creditors.

The settlement of the issue regarding replacement liens on the Preference Settlement Account arose as follows. On November 7, 2005, the Secured Creditors, through their agent, filed a complaint against Webster, commencing *Nortel Networks, Inc. v. Webster*, Adversary Proceeding No. 05-10077, seeking a determination that by reason of the use of their cash collateral, diminishing the value of their cash collateral, they had replacement liens pursuant to the terms of the *Interim Cash Collateral Order* in an amount not less than $2.9 million on Webster's recoveries in avoidance actions under Chapter 5 of the Bankruptcy Code. For various reasons, that litigation was still pending in the summer of 2009.

On July 27, 2009, The Hartford filed its *Application for Immediate Distribution of Allowed Chapter 7 Administrative Expense Claim* (Dkt. No. 1119). On August 5, 2009, the Secured Creditors filed their own *Application for Allowance of Administrative Expenses and Request for Payment* (Dkt. No. 1121), asserting that they were entitled to an administrative expense claim in the amount of $7,476,692.23 based on the use of their cash collateral in the case. On August 7, 2009, The Secured

24

Creditors filed an opposition (Dkt. No. 1124) to The Hartford's

*Application*, arguing that all estate funds were encumbered by

their liens and that their collateral could not be surcharged by

Webster under § 506(c) as The Hartford Chapter 7 administrative

expense conferred no benefit on the Secured Creditors.  Webster

filed a similar opposition.  On October 7, 2009, the court

entered an order (Dkt. No. 1136) denying The Hartford's

*Application*, and stating:

> 1. The application is premature until the court
> disposes of Nortel Networks Inc. v. Webster, Adversary
> Proceeding No. 05-10077, which will determine the extent
> to which the estate holds any assets that are not
> encumbered by Nortel's liens.

> 2. Moreover, the trustee, not Hartflord [sic], is
> the party entitled to invoke section 506(c) to attempt to
> surcharge Nortel's collateral.

> 3. Finally, it is impossible at this juncture to
> establish the extent of competing administrative claims
> of the chapter 7 case (which would share with Hartford's
> claim on a pro rata basis with respect to estate assets
> that prove to be available for chapter 7 administrative
> claims). There is a sizeable administrative claim by
> Nortel itself, and the trustee's attorneys are engaged in
> conducting litigation that will spawn further attorney's
> fees as a chapter 7 administrative claim.

On November 4, 2009, Webster filed a *Joint Motion* (Dkt. No. 1144)

that laid out a stipulation between Webster and the Secured

Creditors whereby the Secured Creditors released claims against

Webster and allowed for certain administrative claims to be paid

from a surcharge of the Secured Creditors' collateral under

§ 506(c).  On November 24, 2009, The Hartford objected (Dkt. No.

25

1151) to Webster's *Joint Motion* with Secured Creditors,
contending that Webster ought not be entitled, as proposed, "to
surcharge [the] collateral pursuant to 11 U.S.C. § 506(c) for
only some of the administrative claimants in this case," and
contending that Hartford's administrative claims could be
surcharged by Webster under § 506(c).[13]

On December 8, 2009, to dispose of that objection, Webster,
the Secured Creditors, and The Hartford filed a *Stipulation* (Dkt.
No. 1157) that in large part mirrored the stipulation Webster and
Secured Creditors sought in the *Joint Motion* except that it
included a payment of $250,000 to The Hartford ($125,000 of which
the Secured Creditors agreed to pay from the amount they were to
receive from the Preference Escrow and $125,000 of which was to
be paid from the part of the Preference Escrow to be received by
Webster), in partial satisfaction of The Hartford's
administrative claims, subject to pro rata distribution at the
end of the case.  The Hartford agreed to withdraw its adversary
proceeding against Webster and its objection to the *Joint Motion*.
The *Joint Motion* was granted by the *Order Approving the*

---

[13]  On December 4, 2009, The Hartford also initiated an
adversary proceeding (Adv. Pro. No. 09-10049) against Webster
seeking an order requiring Webster to surcharge the Secured
Creditors' cash collateral under § 506(c) for The Hartford's
allowed administrative claim, and to enjoin Webster from entering
into any settlement disregarding that right of surcharge.

*Compromise of Controversy by and Among Trustee, Agent, and
Hartford* ("*Order Approving Compromise.*") (Dkt. No. 1158).

Pursuant to the approved settlement, the Secured Creditors
received $2,375,000.00 of the Preference Escrow and $400,000.00
of the remainder of other proceeds held by Webster, and released
its liens on all other estate assets.  As a result of the
settlement, Webster paid numerous administrative claims of an
ordinary course of business character.  In addition, Webster and
his law firm obtained further interim payments in accordance with
11 U.S.C. § 331.  Pursuant to amounts approved incident to the
order approving the settlement and pursuant to prior orders,
Webster received by the end of 2009 a total of $1,042,754.63 for
interim commissions and $26,497.56 for interim reimbursement of
expenses, and his law firm had received a total of $2,554,205.36
in interim compensation and reimbursement of expenses.

On December 1, 2015, the court entered an order (Dkt. No.
1210) granting Webster's law firm's final application for
compensation (in the amount of $43,023.00) and reimbursement of
actual, necessary expenses (in the amount of $30,288.24) for the
period of November 2, 2009, to November 2, 2015, but the court's
order stated that "the trustee shall assure that any distribution
to his attorneys is in accordance with any obligation to limit
distributions on administrative claims of the chapter [7] case to
a pro rata share of available estate funds."

27

On August 8, 2017, Webster filed his *Final Report* (Dkt. No. 1290) informing the court that Webster held a remaining $340,550.89 and a proposed plan to pay remaining administrative claims.  The *Final Report* listed the unpaid amounts of compensation and reimbursement of expenses still owed him and his law firm totaling $87,981.46, and sought approval of payment of those amounts on a pro rata basis with the unpaid balance of the claim of The Hartford for $613,169.62 and the unpaid claim of the United States Trustee for $500.00.  No party objected to the *Final Report*; however, the court noticed that the *Final Report* did not provide a pro rata distribution of remaining funds to all administrative claims.  The *Final Report* provided that by way of prior interim payments and the additional payments proposed to be made to Webster and his law firm they would receive payment of over 98% of their claims and there would be only payment of roughly 62% of the claims that Lander, The Hartford, and the U.S. Trustee had asserted in the case.  On September 20, 2016, the court issued an order (Dkt. No. 1292) requiring the parties to show cause why the court ought not require Webster to file an amended final report that would require a distribution of the

remaining $340,550.89 toward payment of the U.S. Trustee's and

The Hartford's claims.[14]

Webster contended that amounts Webster had recovered

pursuant to a surcharge under 11 U.S.C. § 506(c) were payable to

only the administrative claims that provided the benefit to the

secured creditor's collateral that justified the surcharge.  The

U.S. Trustee and The Hartford contended that § 506(c) was a

recovery provision for the benefit of the estate.  Moreover, the

U.S. Trustee and The Hartford asked the court to order a partial

disgorgement of the payments received by Trustee and his law firm

to ensure pro rata distribution in line with § 726(b).  Webster

requested the court to overturn its decision in *Guinee v. Toombs

(In re Kearing)*, 1 B.R. 7 (Bankr. D.D.C. 1994), wherein the court

found that it was within the court's discretion to require a

disgorgement of fees to ensure pro rata distribution of estate

funds under § 726(b).  If the court upheld *Kearing*, Webster

requested the court to find that disgorgement was inappropriate

under the *Order Approving Compromise*.

---

[14]   The court's order to show cause did not mention
distributing any part of the $340,550.89 to Lander.  Webster*'s
Final Report* represented that Lander had been paid $37,051.83 of
a $37,179.73 claim, and proposed paying Lander the unpaid $127.90
balance of that claim.  Accordingly, the court believed that any
further distribution to Lander would be inconsistent with
§ 726(b).  However, after issuance of the order the court learned
that Lander actually had a claim of $59,685.  Lander had
initially been paid his full claim of $59,685, but upon the
insistence of Webster, Lander returned $22,633.17, leaving an
unpaid balance of $37,051.83.

On October 2, 2017, the court issued the *Memorandum Decision* and concluded that 11 U.S.C. § 506(c) was a recovery provision for the benefit of the estate, not any particular claimant; upheld *Kearing*; and found that disgorgement was appropriate in this case.

The *Motion to Alter* followed.  At the hearing on the *Motion to Alter*, Webster argued that even if *Kearing* was correct, and the court's analysis of § 506(c) was correct, this is not a § 506(c) surcharge case, but a cash collateral case.  Webster further contended that the court did not give due consideration to the understanding and views of the Secured Creditors and The Hartford when it interpreted the *Stipulation*.  Webster further contended that the court did not correctly balance the equities when it ordered disgorgement.  After the hearing, the court took the matter under advisement.

IV

WEBSTER'S ARGUMENTS

In his *Motion to Alter*, Webster and his law firm (which I may refer to collectively as "Webster") emphasize that all of the debtor's assets were encumbered.  Webster makes essentially seven arguments:

(1) He contends that the Secured Creditors consented to the payments of administrative claims made out of their cash collateral, thus making it inappropriate to treat such payments

to him and his law firm as subject to partial disgorgement to achieve a pro rata distribution as contemplated by § 726(b).

(2) Webster cites two decisions that treat 11 U.S.C. § 330(a)(5) as barring disgorgement to achieve a § 726(b) distribution.

(3) He next contends that, in interpreting the *Stipulation* (Dkt. No. 1157)[15] that is at issue, the court did not consider the understanding and view of the Secured Creditors and The Hartford when they entered into the *Stipulation*, and that only a pro rata distribution of remaining funds was contemplated.

(4) Webster argues that The Hartford and the United States Trustee are estopped and barred from objecting to his *Final*

---

[15] The *Stipulation*'s full title is:

Stipulation of Chapter 7 Trustee, Agent, and The Hartford Fire Insurance Company Pursuant to, *inter alia*, Sections 105, 350, 363, 704, 725 and 726 of the Bankruptcy Code, and Bankruptcy Rules 2002(a)(2), (3), (6), 3012 and 9019(b), Regarding Compromise of Controversies with Respect to (I) Trustee's Recovery, Under Section 506(c) of the Bankruptcy Code, from Certain Property in Which Agent Has an Interest, (II) Trustee's Disposition, Under Section 725 of the Bankruptcy Code, of Property in Which Agent Has an Interest, Before, and In Aid, of Trustee's Final Distribution, and (III) Trustee's Distributions in Payment of Certain Chapter 7 Administrative Expenses Under Section 726(a) and (b) of the Bankruptcy Code; and Order Authorizing and Approving Stipulation.

The *Stipulation* is found at Exhibit 43 of the *Motion to Alter*. The Agent referred to is Nortel Networks Inc., which acted as the administrative agent of the Secured Creditors.

*Report* and from seeking disgorgement when they failed timely to object to the *Final Report*.

(5) Webster argues that even if the court had discretion to consider ordering a partial disgorgement, the court improperly balanced the equities in exercising such discretion.

(6) Webster notes that administrative claimants other than Webster and his law firm received amounts that exceeded a pro rata distribution under § 726(b).  Based on that, he argues that if any disgorgement is appropriate, the court should require Webster and his law firm to disgorge based on what would have happened had all administrative claimants shared pro rata.

(7) Finally, Webster argues that Secured Creditors may be incentivized to reassert their claims if the court orders disgorgement.

V

THE SECTION 506(c) SURCHARGES
OF THE SECURED CREDITORS' COLLATERAL IN
THIS CASE WERE PROPERTY OF THE BANKRUPTCY ESTATE
AND DID NOT BELONG TO THE ADMINISTRATIVE CLAIMANTS
WHOSE SERVICES GAVE RISE TO THE RIGHT TO SEEK A SURCHARGE

Preliminary to addressing Webster's specific arguments, I reiterate the view I took in the *Memorandum Decision* that 11 U.S.C. § 506(c) is a recovery statute for the benefit of the estate.  The interim payments to Webster and his law firm included amounts recovered from the portion of the Preference Settlement Account that was not encumbered by replacement liens

32

in favor of the Secured Creditors' liens, and those recoveries were plainly property of the estate. However, some of the recoveries of funds to make the interim payments came from cash collateral of the Secured Creditors. Those recoveries as well were property of the estate.

Webster was able to obtain orders authorizing him to use cash collateral of the Secured Creditors to make interim payments to himself and his law firm because he was entitled to invoke 11 U.S.C. § 506(c) to request that he be allowed to surcharge the Secured Creditors' cash collateral. *See Motion to Alter* at 8 ("the Trustee paid the following administrative claims for professional fees, compensation and expenses pursuant to surcharges against the secured creditors' collateral approved by the Court under § 506(c)").

Section 506(c) provides:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property.

An entity that provided services to a trustee giving rise to expenses incurred by the trustee for which the trustee is entitled to recover § 506(c) surcharges against a secured creditor's collateral is not entitled to pursue a § 506(c) surcharge in its own right. The Bankruptcy Code vests that power

33

in only the trustee.  *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1 (2000).

A § 506(c) surcharge recovered out of a secured creditor's collateral is property of the bankruptcy estate under 11 U.S.C. § 541(a)(7), and must be administered according to the priority rules in Bankruptcy Code § 726(a) and (b).  *See Ford Motor Credit Co. v. Reynolds & Reynolds Co. (In re JKJ Chevrolet, Inc.)*, 26 F.3d 481, 484 (4th Cir. 1994) ("When a trustee recovers postpetition costs and expenses from a secured creditor pursuant to § 506(c), the recovered funds become available as an unencumbered asset for distribution to the unsecured creditors. *See* 11 U.S.C.A. §§ 541(a)(7), 726(a) (West 1993).").

This follows because permitting § 506(c) recoveries to be distributed disproportionately to only a few Chapter 7 administrative claimants would impermissibly create "priorities within the classes that Congress created" and "lead directly to . . . violations of the distribution scheme created by Congress and set forth in § 726(b)."  *Central States, S.E. & S.W. Areas Pension Fund v. Robbins (In re Interstate Motor Freight Sys. IMFS, Inc.)*, 71 B.R. 741, 744-45 (Bankr. W.D. Mich. 1987).  *See also JKJ Chevrolet, Inc.*, 26 F.3d at 484 (§ 506(c) ought to be applied in a way that does not "circumvent the distribution scheme"); David Gray Carlson, *Surcharge and Standing: Bankruptcy Code Section 506(a) After Hartford Underwriters*, 76 Am. Bankr.

34

L.J. 43, 63 (2002) ("Carlson") (if "the trustee can divert the proceeds of her § 506(c) claim to a favored administrative creditor in derogation of Bankruptcy Code priorities . . . it quite subverts the priority system that Congress very carefully legislated in the Bankruptcy Code.").

As the Court noted in *Hartford Underwriters*, "the trustee is obliged to seek recovery under [§ 506(c)] whenever his fiduciary duties so require."  530 U.S. at 12.  This implies that a trustee's § 506(c) recoveries belong to the estate of which the trustee is the fiduciary for the benefit of administrative claimants and unsecured creditors.  The trustee's fiduciary duties are exercised on behalf of the estate, not a particular administrative claimant.

The decision relied upon by Webster, *Debbie Reynolds Hotel & Casino, Inc. v. Calstar Coporation, Inc. (In re Debbie Reynolds Hotel & Casino, Inc.)*, 255 F.3d 1061 (9th Cir. 2001), takes a contrary and erroneous view of § 506(c).[16]  As to the question of who owned § 506(c) recoveries, the court of appeals viewed itself

---

[16]  The court of appeals further appears to have viewed the trustee's counsel as having had a contractual commitment from the secured creditor that its services would be paid from the secured creditor's recoveries out of its collateral, 255 F.3d at 1068 n.4, in other words, a carve-out. (For reasons discussed later, there was no carve-out here).  When the administrative claimant has obtained such a carve-out, its recovery from the collateral is not a § 506(c) recovery.  *See* Carlson, 76 Am. Bankr. L.J. at 48-50.  The decision in *Debbie Reynolds* arguably was a carve-out decision, and ought not have analyzed the issues as involving who owns a § 506(c) recovery.

as bound by a decision, *North County Jeep & Renault, Inc. v. General Electric Capital Corp. (In re Palomar Truck Corp.)*, 951 F.2d 229 (9th Cir. 1991), decided before the decision in *Hartford Underwriters*. (For reasons explored above, *North County Jeep* was no longer valid after *Hartford Underwriters*. In any event, here, no decision by the Court of Appeals for the District of Columbia Circuit ever addressed the § 506(c) ownership question.) *Debbie Reynolds* must be rejected on the ownership question because it is at odds with the principle of equality of distribution embodied in § 726(b), and with the fiduciary duties mentioned in *Hartford Underwriters* that are exercised on behalf of the estate, not a particular administrative claimant.

VI

THERE WAS NO ORDER AUTHORIZING A
CARVE-OUT FOR PAYMENT OF THE TRUSTEE'S COMMISSION AND
HIS LAW FIRM'S FEES FROM THE SECURED CREDITORS' COLLATERAL

Webster argues that this was a case of consensual use of cash collateral under § 363(c)(2). Whatever was the basis for using the cash collateral to pay administrative claims, whether it was § 506(c) or instead § 362(c)(2), the cash collateral was **estate property** (although it was encumbered) that was used to make the payments. *See In re Ben Franklin Retail Store Inc.*, 210 B.R. 315, 319 (Bankr. N.D. Ill. 1997) ("the property of this estate may be encumbered, but it is still property of this estate."). At the end of the day, distributions of **estate**

36

**property** to pay Chapter 7 administrative claims must be assessed

in light of the command of § 726(b) that the claims be paid on a

pro rata basis.  In any event, the *Motion to Alter* at 8, takes

the position that the recoveries used to make interim payments to

Webster and his law firm were via § 506(c) (and those recoveries,

as discussed earlier, were property of the estate).  Moreover,

some of those interim payments were from the portion of the

Preference Settlement Account that was not encumbered by

replacement liens in favor of the Secured Creditors.  Webster

argues that the § 506(c) recoveries came from cash collateral

that the Secured Creditors were free to be allowed to be used as

they chose, and they agreed that the recoveries were to be paid

to the entities who provided the services forming the grounds for

the surcharges.  However, that is merely the trustee's argument,

already rejected by the *Memorandum Decision*, that under *Debbie*

*Reynolds* a § 506(c) recovery belongs to the entity whose services

gave rise to the expense for which the surcharge is made.

When there have been prior interim distributions on

administrative claims that result in the recipients of those

distributions receiving a disproportionately high percentage of

their claims in comparison to other claims, disgorgement is

appropriate to achieve a pro rata distribution.  This is true

regardless of whether the earlier payments of administrative

claims were from unencumbered funds; funds recovered by the

trustee by way of surcharge under § 506(c); or funds that were

used pursuant to consent of a secured creditor under § 363(c)(2).

There is an exception to the foregoing observation, namely,

a "carve-out" whereby a secured creditor has committed that its

collateral (or a portion thereof) will be used to pay

professional fees incurred by typically a debtor-in-possession's

professionals.  This case involved no carve-out.  As noted in *In*

*re U.S. Flow Corp.*, 332 B.R. 792, 795-96 (Bankr. W.D. Mich.

2005):

> One court has defined a carve-out as "[a]n agreed upon
> term in a cash collateral stipulation where a specific
> amount of the cash collateral, either in existence or to
> be generated, is earmarked for the payment of counsel
> fees and disbursements where the payment thereof is not
> conditioned upon a specific event or occurrence." *Harvis*
> *Trien & Beck, P.C. v. Federal Home Loan Mortgage Corp.*
> *(In re Blackwood Assocs., L.P.)*, 187 B.R. 856, 860
> (Bankr. E.D.N.Y. 1995), *aff'd*, 153 F.3d 61 (2d Cir.
> 1998).  Another commentator has defined a carve-out as "a
> portion of postpetition loan proceeds that is reserved
> specifically to pay attorneys and other professionals of
> a DIP."  Craig B. Cooper, *The Priority Of Postpetition*
> *Retainers, Carve-Outs, And Interim Compensation Under The*
> *Bankruptcy Code*, 15 Cardozo L.Rev. 2337, 2346 (1994).

*See also In re ACI Concrete Placement of Kansas, LLC*, 604 B.R.

400, 401 (Bankr. D. Kan. 2019).  As explained in *In re*

*Appalachian Star Ventures, Inc.*, 341 B.R. 222, 229 (Bankr. E.D.

Tenn. 2006):

> Although not expressed by the *U.S. Flow* court in these
> words, the carve-out was, in effect, an assignment of the
> secured lenders' lien position to the extent of the
> carve-out, rendering the professionals secured creditors,
> with a greater priority in the carve-out funds than other
> administrative claimants.  Because the professionals were

38

> not equally situated with the other administrative
> claimants, § 726(b) and *Specker Motors* [*Specker Motor
> Sales Co. v. Eisen*, 393 F.3d 659 (6th Cir. 2004)] had no
> applicability.

As explained below, the record makes abundantly clear that there
was no such carve-out placing the interim payments beyond
disgorgement as receipts of non-estate property. Instead, the
payments of Webster and his law firm out of cash collateral of
the Secured Creditors to Webster and his law firm arose from
surcharges under 11 U.S.C. § 506(c), and such surcharges are a
recovery of estate property. Necessarily, such surcharge funds
are not a carve-out. Payments of interim distributions under
§ 331 out of such recoveries are subject to disgorgement when
necessary to achieve an equality of distribution.

The payments to Webster and his law firm from cash
collateral were always considered to be a surcharge from the
Secured Creditors' collateral (or, in the case of distributions
from the Preference Settlement Account, were from unencumbered
funds). That payments out of encumbered funds were surcharges
under § 506(c) is made most plain by *Webster' Motion to Approve
Interim Disbursement of Sales Proceeds and Establish Procedure
for the Resolution of Disputed Administrative Claims* at 6 (Dkt.
No. 713) where Webster represented to the court that for expenses
through April 30, 2001, "[t]he Secured creditors have consented
to payment of the Trustee's compensation and attorneys' fees and
expenses, as a surcharge against the Secured creditors'

39

collateral, for compensation and attorneys' fees and expenses for
services rendered through April 30, 2001." The motion further
explains that "[t]he Trustee shall have the right to submit a
supplemental claim for compensation and attorneys' fees and
expenses based upon any cash or cash equivalents received or
services rendered after April 30, 2001." Webster again
acknowledged in his Second (Dkt. No. 1083) and Third (Dkt. No.
1138) *Applications* for compensation that he was being paid
pursuant to "11 U.S.C. §§ 326, 331, and 506(c)." Webster's law
firm equally acknowledged its compensation under § 506(c) in its
Fourth (Dkt. No. 1000), Fifth (Dkt. No. 1051), Sixth (Dkt. No.
1092), Seventh (Dkt. No. 1103), and Eighth (Dkt. No. 1141)
*Applications* for compensation, with the opening sentence,
indicating that the law firm "respectfully petitions this Court
for interim compensation and reimbursement of actual, necessary
expenses pursuant to 11 U.S.C. §§ 330 and 506(c)."

Moreover, the *Stipulation* used the language of a § 506(c)
surcharge by indicating that the administrative claims at issue,
including Webster and his law firm's administrative claims, were
"reasonable, necessary cost[s] and expense[s] of preserving or
disposing the Lenders' Collateral which benefitted the Lenders'
Collateral." *Stipulation* at 4.

Finally, the *Stipulation* is a § 506(c) surcharge agreement
that all administrative claims, including Webster and his law

40

firm's administrative claims, were "reasonable, necessary cost[s]
and expense[s] of preserving or disposing the Lenders' Collateral
which benefitted the Lenders' Collateral." *Stipulation* at 4.

Most carve-outs arise in Chapter 11 cases. In Chapter 11
cases, the debtor-in-possession (exercising the powers of a
trustee) occasionally obtains court approval of postpetition
financing pursuant to which the lender agrees (as a term approved
by the court) that specified sums of the lent funds will be
carved out to pay the debtor-in-possession's attorney's fees.
Alternatively, such a carve-out may be embodied in a cash
collateral order with respect to the collateral of an existing
secured creditor.

Similarly, in a Chapter 7 case, a trustee may investigate
hiring counsel but the counsel might insist on assurances that
counsel will be paid. In that circumstance, the trustee might
seek a court order authorizing, as a term of employment, that
counsel have a retainer consisting of a security interest in
future § 506(c) recoveries. Under 11 U.S.C. §§ 327(a) and
328(a) and Fed. R. Bankr. P. 2014(a), counsel for a trustee is
employed only on terms approved by the court. *See In re Cryptek,
Inc.*, No. 08-17324-SSM, 2010 WL 5330507, at *5 (Bankr. E.D. Va.
Dec. 21, 2010) (bankruptcy court ordered partial disgorgement,
from a postpetition retainer that had not been approved by the
bankruptcy court, to achieve pro rata distribution as required by

41

§ 726(b).)  The court's order approving the employment of
Webster's law firm did not approve as a term of employment that
the law firm would be entitled to look to future § 506(c)
surcharge recoveries as a retainer (a security interest) for
payment of the law firm's fees incurred in the case.  Had such a
term been approved, effecting a transfer of a lien on estate
property (future § 526(c) recoveries) to the law firm, that would
have assured that the law firm that it would be paid ahead of
other administrative claims in the case despite the equality of
distribution that would otherwise be mandated by 11 U.S.C.
§ 726(b).

In *Hartford Underwriters*, 530 U.S. at 12, the Court
suggested a security interest on § 506(c) recoveries as a way for
a postpetition service provider to assure that it would be paid
by stating that the provider "may be able to obtain superpriority
under § 364(c)(1) or a security interest under § 364(c)(2), (3)
or § 364(d)."  However, such financing under 11 U.S.C. § 364
requires court approval.  There was no court-approved financing
of that nature in this case.

Webster's *Motion to Alter* does not specifically argue that there was a carve-out, and for good reason.[17]  Webster and his law firm were not given assurances via a carve-out order that the Secured Creditors' collateral was earmarked for payment of Webster's commission and his law firm's fees, effectively transferring to Webster and his law firm the Secured Creditors' lien on collateral as a lien securing payment of their administrative claims ahead of the rights of other administrative claimants.  This case did not entail any sort of carve-out for the benefit of Webster and his law firm.  The *Interim Agreement and Consent Order Authorizing Debtor to Use Cash Collateral and Granting Adequate Protection* (Dkt. No. 50) and the *Order Authorizing Trustee to Operate Debtor's Business* (Dkt. No. 140)

---

[17]  Webster argues:

When assets of the bankruptcy estate constitute cash collateral, and the estate representative, such as a trustee, seeks authorization to use cash collateral either from the secured creditors or from the court, it is understood that, as a general rule, "[a] secured creditor may consent to the use of its collateral **as it chooses**" (see, e.g., *Debbie Reynolds Hotel & Casino, Inc. v. Calstar Corp, Inc. (In re Debbie Reynolds Hotel & Casino, Inc.)*, 255 F[.]3d 1061, 1067 (9th Cir. 2001) (emphasis added)).

*Motion to Alter* at 13.  The statement that "[a] secured creditor may consent to the use of its cash collateral as it chooses" does not appear in *Debbie Reynolds.*  Instead, it appears in Richard B. Levin, *Almost All You Ever Wanted to Know About Carve Out*, 76 Am. Bankr. L.J. 445, 448 (2002).  Webster's *Motion to Alter* does not explore the requirements for a carve-out to exist, which sorely were not met in this case.  Webster's reliance on *Debbie Reynolds* is not persuasive for reasons already explained.

43

did not include a carve-out for Webster or his law firm.[18]   The

Secured Creditors did not agree that in advance of Webster's law

firm's providing services, the Secured Creditors would make a

carve-out from the Secured Creditors' collateral for the payment

of Webster's law firm's fees for work of benefit to the Secured

Creditors to assure that the law firm would be willing to perform

such work for Webster.   In other words, the law firm did not

perform work in reliance on a contractual commitment of the

Secured Creditors to pay the law firm's fees (or a court-approved

commitment of Webster that § 506(c) recoveries were earmarked for

payment of the firm's fees ahead of the claims of other

administrative claimants).   The court entered no order approving

such an arrangement.

Such an arrangement would have required approval of the

court by reason of 11 U.S.C. §§ 327(a) and 328(a) and Fed. R.

Bankr. P. 2014(a) as a term of employment of the law firm and

also because it would be an agreement regarding use of property

---

[18]   The *Order Authorizing Trustee to Operate Debtor's
Business* (Dkt. No. 140) *did* include a carve-out of § 506(c)
recoveries for Verizon by providing that:

> Verizon shall receive a surcharge against the collateral
> of the Secured Creditors as defined in the Order Granting
> Certain Relief entered on Nov. 13, 2000, and the trustee
> shall promptly pursue recovery of that surcharge for the
> benefit of Verizon and pay the Surcharge (upon recovery)
> to Verizon: this surcharge shall cover the period of
> September 28, 2000 to November 13, 2000.

The *Order* included no such carve-out for Webster or his law firm.

of the estate out of the ordinary course of business requiring
court approval under 11 U.S.C. § 363(b)(1): the debtor's assets
may have been fully encumbered, but they remained property of the
estate albeit subject to liens.

The Secured Creditors consistently maintained that
administrative claimants were not entitled to assert surcharge
claims. *See Order Approving Joint Stipulation of Potomac
Electric Power Company, the Trustee, Wendell W. Webster, and
Nortel Networks Inc. Regarding Pepco's Administrative Expense
Claims* (Dkt. No. 789, entered July 26, 2002) at ¶ 8.[19]  Because
the sale proceeds were fully encumbered, Webster could not
utilize the proceeds to pay administrative claims unless he first
made a recovery under § 506(c) based on showing, to the
satisfaction of the Secured Creditors, that the specific expenses
at issue that he had incurred had benefitted the Secured
Creditors.  Nothing in the record negates the conclusion that
payments from cash collateral were via § 506(c) surcharges.
Webster's and his law firm's fees were paid incident to orders
determining that they had conferred benefits on the Secured

---

[19]  Webster recognized this in his *Motion to Approve Interim
Disbursement of Sales Proceeds and Establish Procedure for the
Resolution of Disputed Administrative Claims* (Dkt. No. 713 filed
on Nov. 16, 2001), stating that "bankruptcy law is clear that the
Trustee alone has standing to prosecute claims under 11 U.S.C.
§ 506(c).  *See Hartford Underwriters Ins. Co. v. Union Planters
Bank*, 530 U.S. 1 (2000)."

45

Creditors.[20]  The orders simultaneously authorized payment of the

§ 506(c) recoveries to Webster and his law firm as interim

payments under § 331, but that does not alter that the surcharges

recovered by Webster became property of the estate, and that the

interim distributions were from property of the estate.

Many other administrative claimants (typically holding

claims for expenses Webster incurred in the ordinary course of

business) asserted the right to payment of their claims from the

Secured Creditors' collateral pursuant to § 506(c).  However,

necessarily recoveries under § 506(c) were by Webster and were

property of the estate even if the orders for such recoveries

simultaneously provided that the amounts recovered were to be

---

[20]  For example, the *Order Approving the Compromise of
Controversy by and among Trustee, Agent, and Hartford* (Dkt. No.
1158) entered December 8, 2009, provided:

> 5.    The Trustee also is authorized to pay and
> disburse the following amounts for Ch. 7 administrative
> expenses, in the aggregate amount of $511,608.06, as
> reasonable, necessary costs and expenses of preserving or
> disposing of the Lenders' Collateral which benefited
> [sic] the Lenders' Collateral under 11 U.S.C. § 506(c):
> . . . Webster, Fredrickson, Correia & Puth: $105,524.00.

> 8. To the extent allowed by separate order, the
> Trustee's payments to Webster, Fredrickson, Correia &
> Puth on its Eighth Application for Compensation and
> Reimbursement of Expenses in the amount of $158,314.50
> and to the Trustee for his Application for Trustee
> Compensation in the amount of $288,447.74 are authorized
> as reasonable, necessary costs and expenses of preserving
> or disposing of the Lender's Collateral which benefited
> the Lenders' Collateral under 11 U.S.C. § 506(c).

paid over to the providers whose services formed the basis for the § 506(c) surcharges.  The Secured Creditors typically included language in orders allowing surcharge of their collateral that the allowed payment out of cash collateral satisfied any § 506(c) surcharge rights with respect to the administrative claimants.[21]  The Secured Creditors thereby protected themselves with respect to any possibility that such providers might seek court authority to exercise Webster's § 506(c) surcharge authority to seek additional amounts, and mooted any issue regarding the ownership of the surcharges.[22]  Nothing in these orders negates that the interim payments to Webster and his law firm were out of § 506(c) recoveries that were property of the estate.

---

[21]  *See*, *e.g.*, *Order Approving Joint Stipulation of Potomac Electric Power Company, the Trustee, Wendell W. Webster, and Nortel Networks Inc. Regarding Pepco's Administrative Expense Claims* (Dkt. No. 789):

> In full and complete settlement of all of Pepco's claims, including prepetition unsecured claims (if any), administrative expense claims and **possible surcharges pursuant to 11 U.S.C. § 506(c),** Pepco shall receive ., . . a cash payment of $15,000.00 . . . to be distributed from the proceeds of the Secured Lenders' collateral presently held by the Trustee.

(Emphasis added.)

[22]  The decision of the Ninth Circuit in *Debbie Reynolds* was decided on July 6, 2001, well before many of those orders that specified that the authorized payments satisfied any possible surcharges under § 506(c).

At oral argument, Webster made an argument, not previously raised, that disgorgement would not benefit the estate (and hence unpaid administrative claims) because disgorgement should be to the Secured Creditors.  Specifically, Webster argued that it was the Secured Creditors' cash collateral that was used to make the payments the court has ordered disgorged, and disgorgement should be made to the entity who supplied the cash collateral.  That is true when the cash collateral paid to a professional is being disgorged because it was cash collateral that the professional had obtained without consent of the secured creditors or court order, and when the secured creditor was entitled to the cash collateral in order to be adequately protected.  *See*, *e.g.*, *Stearns Bldg. v. WHBCF Real Estate (In re Stearns Bldg.*), 165 F.3d 28 (6th Cir. 1998) (rents used as retainer for attorney were cash collateral that could not be used without adequate protection and had to be disgorged).  Here, in contrast, the Secured Creditors no longer have a claim in the case in need of adequate protection and the surcharges (deemed under § 506(c) to have benefitted the Secured Creditors) became property of the estate free and clear of the Secured Creditors' liens.

VII

THE COURT HAD AUTHORITY TO ORDER DISGORGEMENT AND 11
U.S.C. § 330(a)(5) DID NOT DEPRIVE THE COURT OF SUCH AUTHORITY

The court has authority to order the requested disgorgement in order to achieve compliance with § 726(b).  As noted in *In re*

48

*Strand*, 374 F.3d 854, 858 (9th Cir. 2004), "[b]ecause interim awards are interlocutory and often require future adjustments, they are 'always subject to the court's reexamination and adjustment during the course of the case.'" (citing *In re Evangeline Ref. Co.*, 890 F.2d 1312, 1321 (5th Cir. 1989) (quoting 2 Collier on Bankruptcy ¶ 331.03 (15th ed.)).   In *Specker Motor Sales Co. v. Eisen*, 393 F.3d 659 (6th Cir. 2004), the court held that disgorgement of interim compensation in an administratively insolvent case in order to achieve pro rata distribution to all similarly situated claimants is mandatory under § 726(b).   Other courts hold that disgorgement is discretionary in that circumstance.

In seeking reconsideration, Webster cites two decisions which treat 11 U.S.C. § 330(a)(5) as the sole authority for ordering a disgorgement of interim payments of compensation to professionals.   *See In re St. Joseph Cleaners, Inc.*, 346 B.R. 430, 439 (Bankr. W.D. Mich. 2006); *In re Headlee Mgmt. Corp.*, 519 B.R. 452, 459 (Bankr. S.D.N.Y. 2014).   However, in the court's *Memorandum Decision*, the court rejected Webster's argument based on a decision to the same effect, *In re Santa Fe Medical Group, LLC*, 557 B.R. 223 (Bankr. D.N.M. 2016), which followed *St. Joseph*.

Those decisions point to 11 U.S.C. § 330(a)(5), which provides:

49

> The court shall reduce the amount of compensation awarded
> under this section by the amount of any interim
> compensation awarded under section 331, and, if the
> amount of such interim compensation exceeds the amount of
> compensation awarded under this section, may order the
> return of the excess to the estate.

*St. Joseph* and decisions following it reason that because § 330(a)(5) only authorizes the court to disgorge interim fees when the final fee award under § 330(a) is less than interim compensation received under § 331, it follows that disgorgement of interim compensation payments cannot be ordered pursuant to 11 U.S.C. § 105(a) in order that distributions to professionals will have complied with 11 U.S.C. § 726(b). The *Memorandum Decision* explained the reasons for rejecting that conclusion. However, I will elaborate further why the conclusion is in error.

The conclusion in *St. Joseph* and decisions following it amounts to an erroneous application of the canon of *expressio unius est exclusio alterius* ("the expression of one thing is exclusion of others"). In light of § 330(a)(5) providing for disgorgement in only one instance, *St. Joseph* and decisions following it reason that the remedy of disgorgement is unavailable to achieve compliance with § 726(b), as in this case. Such reasoning is flawed.

First, context demonstrates that the canon of *expressio unius est exclusio alterius* does not apply. As noted in *United States v. Castro*, 837 F.2d 441, 442-43 (11th Cir. 1988), "this principle has its limits and exceptions and cannot apply when the

50

legislative history and context are contrary to such a reading of

the statute," citing, among other examples, *Herman & MacLean v.*

*Huddleston*, 459 U.S. 375, 387 n.23, 103 S.Ct. 683, 690 n.23, 74

L.Ed.2d 548 (1983) (rejecting application of *expressio unius*

principle and holding that availability of express remedy under

one section of Securities Act of 1933 did not preclude

maintenance of action under another section of act, in light of

purposes of act).[23]  *See also N.L.R.B. v. SW Gen., Inc.*, ___

U.S.___, ___, 137 S.Ct. 929, 940, 197 L.Ed.2d 263 (2017) (noting

that the force of any negative implication under the doctrine

depends on context, and that the doctrine only applies when the

circumstances support a sensible inference that the term left out

must have been meant to be excluded).  As stated in *Marx v. Gen.*

*Revenue Corp.*, 568 U.S. 371, 381, 133 S. Ct. 1166, 1175, 185 L.

Ed. 2d 242 (2013), "the *expressio unius* canon . . . does not

apply 'unless it is fair to suppose that Congress considered the

---

[23]  As noted in the accompanying footnote in *Castro*, 837
F.2d at 443 n.2, it has been observed in R. Dickerson, *The
Interpretation and Application of Statutes* 234-35 (1975) that:

> it is simply not true, generally, that the mere express
> conferral of a right or privilege in one kind of
> situation implies the denial of the equivalent right or
> privilege in other kinds.  Sometimes it does and
> sometimes it does not, and whether it does or does not
> depends on the particular circumstances of context.
> Without contextual support, therefore, there is not even
> a mild presumption here.  Accordingly, this maxim is at
> best a description, after the fact, of what the court has
> discovered from context.

51

unnamed possibility and meant to say no to it,' *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003), and . . . the canon can be overcome by 'contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion,' *United States v. Vonn*, 535 U.S. 55, 65 (2002)."

Here, context depends first on examining the purpose of the provision that The Hartford and the U.S. Trustee invoked, 11 U.S.C. § 726(b), in seeking disgorgement under 11 U.S.C. § 105(a), in comparison to the purpose of the provision, § 330(a)(5), upon which Webster relies.  Section 330(a) addresses the **allowance** of claims for compensation and reimbursement of expenses, and § 330(a)(5) embodies a remedy of disgorgement of interim compensation under § 331 to assure that only the **allowed amount** of a compensation claim ends up having been paid.  Section 330(a) does not address the **distribution** of the estate's funds in payment of claims that are allowed claims under § 330(a) and claims that are allowed claims under other provisions[24] (and in particular the requirement of equality of distribution addressed by § 726(b)).  In other words, § 726 addresses distribution of estate funds in payment of claims **after they are allowed** under

---

[24]  Some administrative claims, like The Hartford's in this case, are allowed under provisions in 11 U.S.C. § 503(b), not under § 330(a).

§ 330 and other provisions.[25]  It would be odd for Congress to

address in § 330, which addresses **allowance** of certain claims,

whether disgorgement of interim compensation payments allowed

under 11 U.S.C. § 331 is appropriate to achieve compliance with

§ 726(b), a provision having nothing to do with **allowance** of

claims.[26]

Second, § 330(a)(5) does not purport to be a provision

setting forth a list of instances in which disgorgement is

available as a remedy, and only addresses a single instance of

when disgorgement is available, namely, incident to allowing

claims.  As noted in *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S.

73, 81 (2002):

> The canon depends on identifying a series of two or more
> terms or things that should be understood to go hand in
> hand, which is abridged in circumstances supporting a
> sensible inference that the term left out must have been
> meant to be excluded.  E. Crawford, *Construction of
> Statutes* 337 (1940) (*expressio unius* "'properly applies
> only when in the natural association of ideas in the mind
> of the reader that which is expressed is so set over by
> way of strong contrast to that which is omitted that the

---

[25]  Here, the propriety of the dollar amount of interim
allowances of compensation is not contested: no one contends that
the services performed did not justify the allowances at issue.
What is at issue here is not an issue of allowing claims and
instead the issue of whether previous payments of compensation
pursuant to only interim orders can be ordered disgorged as
necessary to assure equality of distribution under § 726(b).

[26]  Section 330(a)(5) confirms the long-standing principle
that an interim allowance of compensation is always subject to
adjustment at the end of the case.  That strengthens the
propriety of ordering disgorgement when necessary to achieve
compliance with § 726(b).

contrast enforces the affirmative inference'" (quoting
*State ex rel. Curtis v. De Corps*, 134 Ohio St. 295, 299,
16 N.E.2d 459, 462 (1938)) (additional citation omitted.)

Section 330(a)(5) does not purport to be a list of instances in
which disgorgement is appropriate.

Finally, § 330(a)(5) must be examined in the context of
Congress having empowered bankruptcy courts in § 105 to "issue
any order . . . that is necessary or appropriate to carry out the
provisions of this title."  As observed in *Adirondack Med. Ctr.
v. Sebelius*, 740 F.3d 692, 697 (D.C. Cir. 2014), "when
countervailed by a broad grant of authority contained within the
same statutory scheme," the canon of *expressio unius est exclusio
alterius* "is a poor indicator of Congress' intent."  (Citations
omitted.)

Accordingly, § 330(a)(5) does not evidence an intention to
bar disgorgement pursuant to 11 U.S.C. § 105 when needed to
assure an equality of distribution on allowed claims under
§ 726(b).  The canon of *expressio unius est exclusio alterius*
does not demonstrate that the court's inherent power under 11
U.S.C. § 105(a) may not be used to order disgorgement in order to
assure that there is an equality of distribution as mandated by
11 U.S.C. § 726(b).

Nor as reasoned in *Santa Fe Medical Group*, 557 B.R. at 229,
and *In re Hyman Freightways, Inc.*, 342 B.R. 575 (Bankr. D. Minn.
2006), *aff'd sub nom. Fokkena v. Fredrikson & Byron, P.A.*, 2006

54

WL 3757972, Civil No. 06-2607(PAM) (D. Minn. 2006), does 11
U.S.C. § 549(a)(2) bar the remedy of disgorgement.  The payments
at issue here were pursuant to interim orders that would not
become final until approval of a final report.  Interim orders
are always subject to adjustment, and necessarily the court's
inherent authority includes the power to order disgorgement of
payments under interim orders in order to assure compliance with
§ 726(b).  *See Matz v. Hoseman*, 197 B.R. 635, 639-40 (N.D. Ill.
1996).  For the court to order a disgorgement of interim
compensation in order to achieve compliance with § 726(b), there
is no need for a trustee to have the power under § 549 to avoid
the interim payments.

VIII

THE COURT PROPERLY INTERPRETED THE STIPULATION

Webster also contends that this court did not properly
interpret the *Stipulation* approved by the court because the court
only took into account Webster's understanding and view of the
*Stipulation* and did not give due consideration to the Secured
Creditors' or The Hartford's understanding and view of the
*Stipulation*.  He argues:

> The Court undertook its analysis of the Stipulation as a
> contract from the point of view of the Trustee and his
> expectations with respect to the finality of his
> compensation, and whether or not disgorgement of
> excessive pro rata distributions to him on his
> commissions and his legal fees was within his
> contemplation or otherwise foreseeable.  The Trustee
> submits that this analysis is too limited in its scope,

55

> given the fact that the funds from which the Trustee was
> being paid his commission and his legal fees constituted
> the cash collateral of the secured creditors.

*Motion to Alter* at 18. This is just a recasting of the trustee's

argument under *Debbie Reynolds*: that because the estate's assets

were the secured creditor's cash collateral he could pay the

funds to himself without such distributions being subject to the

priority scheme of § 726(b). Recoveries out of cash collateral

pursuant to § 506(c) are property of the estate whose

distribution is subject to examination under § 726(b).

A.    The Secured Creditors' Understanding and View of the
      *Stipulation*.

Webster contends that the court did not take into account

the Secured Creditors' view and understanding of the *Stipulation*

when it wrote the *Memorandum Decision*. The court has a

difficulty understanding how this contention is relevant to the

matter before it. First, the Secured Creditors are not parties

to this disgorgement proceeding, and when they entered into the

*Stipulation* they had no stake in the issue of whether the court

ought to treat The Hartford and the United States Trustee as

entitled later to seek a pro rata distribution of estate funds to

Chapter 7 administrative claimants, and to obtain a disgorgement

of funds from Webster and his law firm if necessary to assure

that such claimants receive payment on a pro rata basis.

Second, the court's interpretation of the *Stipulation* leaves

the rights of the Secured Creditors unaltered. There is no

56

reason to believe that they would contend that the court's interpretation of the *Stipulation* was in error.  Webster contends that the Secured Creditors bargained that The Hartford would not benefit from a § 506(c) surcharge.  Webster argues that this may be implied by the fact that the Secured Creditors continually objected to The Hartford's claim being surcharged from their collateral and did so in the initial *Stipulation* that The Hartford objected to.  However, the bargain that the Secured Creditors bargained for in the initial stipulation with Webster was that they would not be surcharged for The Hartford's administrative claims incurred by the estate, not that The Hartford would not later benefit from § 506(c) surcharge recoveries.  In fact, the Secured Creditors could not have bargained for an agreement that would have prevented The Hartford from receiving its pro rata distribution of all unencumbered funds, which include funds Webster recovered via § 506(c) surcharges and paid to himself and his law firm.  To hold otherwise would obliterate the carefully crafted priority scheme of the Bankruptcy Code embodied in § 726(b).  If secured creditors could choose who can and cannot benefit from a § 506(c) surcharge, unfavored administrative claimants could be denied their distributions to which they are entitled under § 726(b).

When looking at the issue in this light, the parties were negotiating a settlement of how much Webster could recover under

§ 506(c), not *who* would eventually be entitled to have the benefit of § 506(c) recoveries in assuring that there was a pro rata distribution under § 726(b).  At the end of the day, the focus of the Secured Creditors was whether certain administrative expenses benefitted their collateral and could be surcharged. Ultimately, the Secured Creditors agreed that it was in their best interest to reach a settlement than to fight over how much the Secured Creditors benefitted from each administrative expense.  The Secured Creditors and Webster agreed that the Secured Creditors did not benefit from The Hartford's administrative expenses.  Accordingly, the Secured Creditors' bargain was that they would not be surcharged for The Hartford's administrative expenses, except an amount of $125,000 as a settlement to resolve The Hartford's challenge of the stipulation initially proposed by Webster and the Secured Creditors.  The *Memorandum Decision* does not alter or change those rights under the approved *Stipulation*.

Accordingly, a review of the Secured Creditors' understanding and view of the *Stipulation* does not provide a basis for altering or amending the *Memorandum Decision*.

   B.   The Hartford's Understanding and View of the
        *Stipulation*.

Webster also contends that the court must take into account The Hartford's view of the approved *Stipulation*.  Webster argues that The Hartford waived its rights to further distribution from

58

the § 506(c) surcharged funds.  Accordingly, Webster contends
that The Hartford believed it would only obtain a pro rata
distribution of the unencumbered funds on hand at the end of the
case, not a pro rata distribution from all § 506(c) surcharges.
He contends that this is evidenced by the fact that The Hartford
never objected to Webster's *Final Report* until after the court
*sua sponte* noted the unfair distribution.  Further, the approved
*Stipulation* granted The Hartford only $125,000 of the § 506(c)
surcharge.

The *Stipulation* does not bear the interpretation Webster
advances.  The *Stipulation* reads in part:

> The Trustee, for purposes of settlement, agrees to
> provide to Hartford from the Released Preference Balance
> a $250,000.00 interim payment in partial satisfaction of
> its allowed Chapter 7 administrative expense claim,
> subject to *pro rata* distribution at the close of the
> case.  [Internal footnote omitted.]

The *Stipulation* conditioned The Hartford's agreement to the
*Stipulation* on the requirement that it was subject "to *pro rata*
distribution at the close of the case," not "to a *pro rata*
distribution of estate funds on hand at the end of the case."
That is something the parties would have made clear if that
distinction was intended.  Under § 726(b), a pro rata
distribution at the end of a case may entail requiring
disgorgement of prior disproportionate payments of claims as
necessary to assure a pro rata distribution.

Further, under the *Stipulation*, The Hartford:

> with the exception of its previously authorized Chapter
> 7 and Chapter 11 Administrative Expense Claims **and the
> rights arising therefrom** releases any and all claims
> Hartford may have against the Trustee, the Ch. 7
> Estates, or Agent through the date of entry of the
> Order Approving the Compromise of Controversy by and
> Among Trustee, Agent, and Hartford.

(Emphasis added.)   One of the rights arising from The Hartford's
Chapter 7 administrative claims was the right at the end of the
case to seek to obtain an order directing Webster and his law
firm incident to consideration of a final report to disgorge
funds as necessary to assure that The Hartford, Webster, and
Webster's law firm would have received pro rata distributions in
the case as mandated by § 726(b).

Furthermore, the history of this case does not support
Webster's contention.   The *Stipulation*, as noted above, was an
agreement mostly between Webster and the Secured Creditors on how
much the Secured Creditors would be surcharged under § 506(c).
The Hartford had objected to the previous stipulation believing
its claim should also be surcharged.   As a settlement, The
Hartford agreed to an immediate interim payment of $250,000,
$125,000 of which would be surcharged from the Secured Creditors'
claims, in exchange for dropping its objections and its suit
against Webster. Nor is there any indication that The Hartford
waived its right to seek disgorgement.   In fact as explained
above, the *Stipulation* appeared to include provisions designed to
protect that right by excepting from the settlement any "rights

60

arising" from The Hartford's claim and any claims The Hartford

may have against the trustee that post-dated the settlement,

which would include through his final distribution.  *See* Dkt. No.

1157 at 5.

Webster also notes that The Hartford did not object to the

*Final Report*, because the *Final Report* was in accordance with The

Hartford's understanding of the *Stipulation*.  The court does not

find this argument persuasive.  The language of the *Stipulation*

is not ambiguous, and it does not support the contention that The

Hartford has waived its right to further pro rata distribution of

unencumbered funds recovered by the § 506(c) surcharges in favor

of Webster and his law firm.  Therefore, the court's

interpretation of the *Stipulation*, taking into account The

Hartford's understanding and view of the *Stipulation*, does not

support altering or amending the *Memorandum Decision*.

IX

WEBSTER'S ESTOPPEL AND UNTIMELINESS ARGUMENTS LACK MERIT

At oral argument, Webster raised a new argument that the

U.S. Trustee and The Hartford should be estopped and barred from

challenging the *Final Report* because both parties failed to file

an objection to the *Final Report* within the 21-day objection

period.[27]  The arguments are barred because they should have been
raised earlier, not by way of a Rule 59 motion.

Moreover, the arguments are without merit.  A party claiming
estoppel by silence or inaction must prove it was misled to its
injury by detrimentally changing its position in reliance on that
silence or inaction.  *Wiser v. Lawler*, 189 U.S. 260, 270 (1903);
*Whetstone Candy Co., Inc. v. Kraft Foods, Inc.*, 351 F.3d 1067,
1076-77 (11th Cir. 2003).  Webster has not articulated any
reliance to his detriment arising from the failure of The
Hartford and the United States Trustee timely to object to the
*Final Report*.  Therefore, estoppel is not an appropriate remedy
here.

As to the issue of untimeliness, Webster failed to object to
the timeliness of the disgorgement requests, and The Hartford and
the United States Trustee had no occasion to seek an enlargement
of time to do so.  Given that the belated raising of the
disgorgement requests did not prejudice Webster (as the *Final
Report* as filed could not be approved), a request for an
extension of time would likely have been granted based on
excusable neglect.  In any event, upon examining the *Final*

---

[27]  Webster noted that the United States Trustee represented
to the court, by filing a note on the docket, that it had
reviewed the *Final Report*.  The United States Trustee responded
that while its office may have reviewed the *Final Report*, it was
reviewed by accountants who reviewed the report for calculation
errors, not by lawyers for compliance with the Bankruptcy Code.

*Report*, the court itself noted the disparity in treatment at issue with respect to the distribution of funds on hand; ordered Webster to show cause why the funds ought not be distributed to The Hartford and the United States Trustee; and invited any party in interest to seek a disgorgement of funds if it were appropriate.  The argument of untimeliness must be rejected.

X

IF DISGORGEMENT WAS DISCRETIONARY AND NOT
MANDATORY, THE COURT DID NOT ABUSE ITS DISCRETION

In *Specker Motor Sales*, the Sixth Circuit viewed disgorgement as mandatory when necessary to assure pro rata distribution under § 726(b).  In light of the long-standing bedrock principle of equality of distribution embedded in § 726(b), it follows that even if a bankruptcy court has discretion not to order disgorgement, "compelling circumstances must be shown to warrant exercise of such discretion."  *In re Kids Creek Partners, L.P.*, 236 B.R. 871, 875 (Bankr. N.D. Ill. 1999).  In ordering disgorgement in this case, I did not err in my exercise of discretion.

Webster contends that the court misapplied the discretionary balancing test it used in the *Memorandum Decision*.  In the *Memorandum Decision*, the court listed four factors from *In re Home Loan Serv. Corp.*, 533 B.R. 302, 309-310.  Those factors include:

63

1) whether the party facing disgorgement reasonably
expected that the payment was final, 2) whether any party
harmed by nondisgorgement objected to the trustee's
proposed final distribution, 3) whether a professional
has reason to believe the goal is unachievable but
continues to unreasonably accrue fees, and 4) whether the
hardship against the professional weighs greater than the
value to the estate.

The First Factor Weighs Heavily Against Webster.  Webster
contends that he never expected that parties would object to his
and his law firm's retention of interim fees and that he would be
required to disgorge such fees.  No party did object, and no
party requested disgorgement until the court noted the unfair
distribution under the *Final Report*.  However, Webster and his
law firm knew that disgorgement might result at the end of the
case, yet both opted to receive interim payments as the case
continued, rather than wait until the end when unencumbered funds
would be distributed pro rata.  This factor weighs heavily
against Webster.

**First, Webster was on notice of the potential that**
**disgorgement might ensue**.  As noted in *In re Chewning & Frey*
*Sec., Inc.*, 328 B.R. 899, 920-21 (Bankr. N.D. Ga. 2005) (footnote
omitted), discussing precedent that pre-dated this case (except
for one 2001 decision issued in the midst of the beginning of
this case):

> Numerous courts have ruled that "professionals seeking
> compensation from the bankruptcy estate do so at the risk
> that the estate will not have sufficient funds to satisfy
> their claims." [quoting *Guinee v. Toombs (In re Kearing)*,

64

170 B.R. 1, 8 (Bankr. D.D.C. 1994)]. *See In re Kids Creek Partners, L.P.*, 219 B.R. 1020, 1022 (Bankr. N.D. Ill. 1998) (hereinafter "*Kids Creek I*") (awarding administrative claim to court reporter and requiring the disgorgement of interim fees paid to trustee's special counsel for pro rata distribution); *Matz v. Hoseman*, 197 B.R. 635, 640 (N.D. Ill. 1996); [*Shaia v. Durrette, Irvin, Lemons & Bradshaw, P.C. (In re Metro. Elec. Supply Corp.)*, 185 B.R. 505, 510 (Bankr. E.D. Va. 1995)]; [and citing *In re Lochmiller Indus.*, 178 B.R. 241, 253-54 (Bankr. S.D. Cal. 1995)]. Many of these courts reason that these professionals practice in the bankruptcy field and are familiar with the Bankruptcy Code. Therefore, they are presumed to have knowledge of section 726(b) and are on notice of the potential for disgorgement or reduction in fees should the estate be administratively insolvent. *Kids Creek Partners, L.P.*, 236 B.R. 871, 878 (Bankr. N.D. Ill. 1999) (ordering the disgorgement of interim administrative fees and expenses by trustee and special counsel because creditors' superpriority claim had priority over administrative expenses); *Kids Creek I*, 219 B.R. at 1022; *Hoseman*, 197 B.R. at 640; *Metro. Elec. Supply Corp.*, 185 B.R. at 509-11. *See also Vernon Sand & Gravel, Inc.*, 109 B.R. at 259; *In re Pacific Forest Indus., Inc.*, 95 B.R. 740, 743 (Bankr. C.D. Cal. 1989) ("The Bankruptcy Code also deals differently with fees of professionals than with payment of other people who provide services to the debtor.... It is only those who deal with the actual reorganization of the debtor (rather than the ongoing business of the debtor) who are required to be employed under § 327 and whose applications for payment must be approved by the Court."). In essence, those who voluntarily represent parties in a bankruptcy case assume the risk of non-payment or disgorgement of interim fees should the case fail. [Citing *In re Wilson-Seafresh, Inc.*, 263 B.R. 624, 632 (Bankr. N.D. Fla. 2001)].

And in the footnote to that passage the court noted this

observation in *Metro Elec.*, 185 B.R. at 511:

> If anything is 'unfair' in this Court's view of this matter, it is that professionals who regularly appear before the Court would force the Trustee to seek a judicial resolution of this dispute when § 726(b) so clearly sets out the priority for payment of administrative claims. The Orders of this Court

> anticipated payment of the awarded compensation from
> funds remaining in the estate, in compliance with
> § 726(b).  The payments made in excess of the amount due
> under § 726(b) are property of the estate, and must be
> returned pursuant to § 542.

See also In re Lochmiller Industries, Inc., 178 B.R. 241, 250

(Bankr. S.D. Cal. 1995) (stating that, in 1995, it could find no

case that did not order disgorgement of interim compensation when

necessary to achieve pro rata distribution among equally situated

creditors), and other decisions (decided prior to the

commencement of this case) discussed in Specker Motor Sales, 393

F.3d at 663.

In light of this court having ruled in 1994 (six years

before this case began) in In re Kearing, 170 B.R. at 8, that

disgorgement is required when necessary to assure pro rata

distribution in compliance with § 726(b), Webster was on notice

that disgorgement might occur.

**Second, Webster and his law firm were actually aware that**

**disgorgement might arise at the end of the case.**  In the Joint

Motion (Dkt. No. 1144) filed on November 4, 2009, by Webster and

the Secured Creditors to approve the settlement regarding the

extent to which the Secured Creditors could assert their liens on

avoidance recoveries, Webster recognized that disgorgement might

be necessary.  The Joint Motion recited:

> Absent this Settlement, Agent would continue to pursue
> its lien claim of approximately $4.2 Million, as well as
> its Ch. 7 administrative expense of $7.4 Million. If
> Agent were to prevail, there could be no currently

66

available funds for distribution to other creditors, and
disgorgement might be necessary to equalize distributions
to holders of Ch. 7 administrative claims.

*Joint Motion* (Dkt. No. 1144) at ¶ 32. *See also* Transcript of

Hearing of August 26, 2008 (Dkt. No. 1112) at 26, in which

Webster's counsel responded to a query of counsel for a creditor:

Are you saying that the -- when the trustee gets paid
interim compensation, that it would be subject to
disgorgement later on, if the other administrative
expenses aren't paid to the same extent?

by stating:

Your Honor, if it helps, it's -- that's always the
case. These are all interim orders.

As discussed earlier, "bankruptcy courts may not create

their own rules of superpriority within a single class." *Matter*

*of Saybrook Mfg. Co., Inc.*, 963 F.2d at 1496. With respect to

this first factor, the facts here demonstrate that there is no

unfairness in ordering disgorgement lest the court unjustly award

Webster and his law firm "a 'superpriority' status that is not

mandated by the Code." *Kearing*, 170 B.R. at 8.

   The Second Factor Does Not Suffice to Warrant not Ordering

Disgorgement. Webster contends that the court did not give

enough weight to the second factor of whether any party harmed by

nondisgorgement objected to Webster's proposed final

distribution. It is true that the parties did not object to the

proposed final distribution until after the court noted the

unequal proposed distribution. This factor is not, however,

dispositive.  In considering this factor, the court was also
considering the underlying principle of the Bankruptcy Code.  The
Bankruptcy Code has set up a comprehensive priority distribution
scheme that ought not be lightly disregarded.  The Hartford and
the United States Trustee may have been asleep at the wheel, but
their belated realization that they were entitled to seek
disgorgement ought not deprive them of the right to pursue that
remedy when other factors weigh in favor of disgorgement and when
there had not been a final order approving the *Final Report*.

   The Third Factor Does not Warrant not Ordering Disgorgement.
The third factor is whether a professional has reason to believe
the goal is unachievable but continues to unreasonably accrue
fees.  Webster disagrees with the court's analysis that the third
factor is inapplicable and argues that it weighs in favor of
Webster, because there is no evidence of improper conduct by
Webster in collecting fees weighs in Webster's favor.  Webster is
correct that this factor weighs in Webster's favor.  Webster's
efforts did produce a benefit to the estate allowing for payment
of the claims that otherwise would not have been paid.  There is
also no indication that Webster and his law firms fees were
unreasonably accrued.  Nevertheless, the court does not find that
this factor sufficiently weighs meaningfully against disgorgement
in this case.  A finding of misconduct is not necessary to order

disgorgement; such a finding merely strengthens the case for

disgorgement.

The Fourth Factor Does not Weigh Against Disgorgement.

Webster also contends that the court did not appropriately weight

the final factor of whether the hardship to Webster would be

greater than the benefit to the estate.  Webster relies on *In re*

*Hyman Freightways* as showing that disgorgement would be

inequitable in this case.  In *Hyman Freightways*, certain Chapter

11 professionals were paid either pursuant to a final order when

the case was in Chapter 11 or pursuant to orders, entered soon

after conversion to Chapter 7, authorizing the payments to be

made from prepetition retainers.  342 B.R. at 577-78.  At the end

of the case, the trustee had sufficient funds to pay all of the

Chapter 7 administrative expenses, but only enough to pay

approximately 10% of the Chapter 11 administrative expenses.  *Id.*

at 578.  Accordingly, the trustee sought to disgorge fees from

the Chapter 11 professionals that were paid under § 331 while the

case was proceeding under Chapter 11 to ensure a pro rata

distribution under § 726.  *Id.*  The court held that disgorgement

was inequitable because the payments were made eight years prior

to the request for disgorgement, all the professionals were

artificial entities, meaning that the people bearing the burden

of refund would be different from the people benefitting from the

payments, and disgorgement would only increase the pro rata distribution by 3%.  *Id.* at 580-581.

However, *Hyman Freightways* is readily distinguished from this case.  Two of the payments in *Hyman Freightways* were pursuant to a final order, and disgorgement is generally viewed as inappropriate when payments have been made pursuant to final orders.[28]  The other payment to a professional was from prepetition retainers.  Although the court in *Hyman Freightways* viewed the retainers as having been property of the estate, nevertheless retainers are designed to give professionals assurances that there will be a source for paying their fees.  If disgorgement of amounts paid out of retainers is allowed, "it would make it even more difficult to find attorneys willing to represent chapter 11 debtors."  *In re Next Generation Media, Inc.*, 524 B.R. 824, 830 (Bankr. D. Minn. 2015).[29]  The retainer character of payments undoubtedly influenced the *Hyman Freightways* court's view that disgorgement would be inappropriate.  The payments here were not out of retainers.

---

[28]  *See In re Rockaway Bedding, Inc.*, 454 B.R. 592, 597 (Bankr. D.N.J. 2011).  *But see Shaia v. Durrette, Irvin, Lemons & Bradshaw, P.C. (In re Metro. Elec. Supply Corp.)*, 185 B.R. 505, 510-11 (Bankr. E.D. Va. 1995).

[29]  Some courts do not treat retainers as property of the estate, and thus view retainers as not subject to disgorgement based on § 726(b).  *See In re Santa Fe Med. Grp., LLC*, 557 B.R. 223, 231 (Bankr. D.N.M. 2016) (citing decisions).

In addition, the payments at issue here were made to Webster and his law firm, the entities who were administering the Chapter 7 case and who had a fiduciary duty to assure that estate funds would be distributed in accordance with § 726(b).  Webster and his law firm were well aware that disgorgement was a possibility in this case if there were an administrative insolvency.

Here, the last payment at issue was made in 2009, and the payments at issue were made over the period of 2001 to 2009. Although Webster did not file his *Final Report* until 2016, the delay in winding up miscellaneous matters in the case does not have any significant impact on the exercise of discretion in addressing disgorgement.  Webster and his law firm received payments throughout the case, whereas The Hartford and the U.S. Trustee, were required to wait until the end of the case.  Where Webster and his law firm received payments over a nine-year period, these other claimants went without anything for the whole 16 years before Webster filed his *Final Report*.  These other claimants should not be punished because Webster elected to use § 506(c) recoveries for the benefit of himself and his law firm instead of these other claimants who were entitled to a pro rata distribution under § 726(b).

In the case of Webster's law firm, the law firm is an artificial entity, and Webster has represented to the court, that several of the partners of his firm have left.  However, Webster

and his law firm were well aware of the possibility that disgorgement might be necessary.

Finally, there is another significant difference between this case and *Hyman Freight*.  Unlike in *Hyman Freight*, where disgorgement would have increased pro rata distribution by only 3%, disgorgement here would increase the pro rata distribution by 30%.  Furthermore, Webster and his law firm are being disgorged only little more than 8% of their claims, whereas the United States Trustee and The Hartford, if no disgorgement was required, would be denied 30% of their claims.  The recovery from Webster and his law firm is significant, and they would enjoy a large windfall if allowed to retain all the interim payments.  The payouts to The Hartford and the United States Trustee would be increased from 62.042% to 91.721%.  See Dkt. Nos. 1321 at 3; 1324 at 6.  In contrast, if disgorgement were not ordered, Webster would recover 99.49% of his claim and his law firm would recover 98.94% of its claim, while The Hartford and the United States Trustee would be paid only 62.042% of their claims.

In exercising my discretion, I placed heavy emphasis on the underlying principle of the Bankruptcy Code to treat similarly situated claims equally.  As noted in the *Memorandum Decision* at 28, "[t]he Bankruptcy Code goes to great lengths to close windfalls and ensure equitable distribution to creditors within a priority scheme established by Congress."  To permit Webster and

his law firm to keep such a high percentage of their claims while other claimants get far less flies in the face of the priority scheme and the Bankruptcy Code.

The Hartford was subrogated to the rights of the landlord to whom it made payments pursuant to the Lease Guaranty Bond, and was entitled under 11 U.S.C. § 365(d)(3) to timely payment of monthly rent incurred in the case prior to Webster's rejection of the lease.  Except for the belated payment under the  approved *Stipulation* (Dkt. No. 1157), Webster failed to make any payments required under § 365(d)(3) while he was using § 506(c) recoveries for the benefit of himself and his law firm.

Webster further implies that he should not be required to disgorge fees because he put in a significant amount of work in what initially appeared to be a no-asset case for the benefit of the estate.  Webster went so far as to say that The Hartford and the U.S. Trustee were enjoying a windfall because the estate was administratively insolvent and The Hartford and the U.S. Trustee were entitled to nothing, and would have gotten nothing, if not for Webster's efforts.  However, the court rejects this argument because if there were not any unencumbered funds to distribute to administrative claims, including The Hartford's and the U.S. Trustee's claims, there would have been no funds to distribute to Webster and his law firm.  In that case, Webster and his law firm

would have equally been entitled to nothing, except the $45 that
Webster would have received under § 330(b).

Furthermore, just because Webster did an extensive amount of
work which produced a great benefit to the estate does not
entitle Webster to a superpriority over other administrative
claims.  If Congress intended for such a result, it would have
written that into the Bankruptcy Code.  However, the Bankruptcy
Code treats a trustee the same as any other administrative
claimant under § 507(a)(2).  Webster is still entitled to only a
pro rata distribution under § 726(b).

XI

THAT OTHER ADMINISTRATIVE CLAIMS HAVE BEEN FULLY PAID
HAS NO IMPACT ON THE PROPRIETY OF THE DISGORGEMENT ORDERED

Webster argues that the disgorgement of payments to him and
his law firm should be adjusted to what would have been the
required disgorgements if other administrative claims paid in
full had received only a pro rata distribution, citing *In re
Anolik*, 207 B.R. 34, 40 (Bankr. D. Mass. 1997).  Of course, as
the court observed in the *Memorandum Decision*, "administrative
expenses paid in the ordinary course of business under
§ 363(c)(1) are not subject to pro rata reductions.  *Kearing*, 170

74

B.R. at 7."[30]  Professional fees paid were not paid pursuant to

§ 363(c)(1).

However, except for Webster, his law firm, and Lander, those

payments of professional fees were pursuant to final orders, not

interim orders under § 331.[31]  As noted previously, payments

pursuant to final orders are generally viewed as not subject to

disgorgement to effectuate § 726(b). *See In re Rockaway Bedding,*

*Inc.,* 454 B.R. at 597.

A final order will not be revisited except by a Fed. R. Civ.

P. 60 motion, made applicable to bankruptcy under Fed. R. Bankr.

P. 9024.  Webster has not pursued a Rule 60 motion for relief

from those orders, or taken any other steps to obtain a

disgorgement of fees paid pursuant to final orders.  The most

recent order was entered at least seven years before Webster

raised this argument, making a Rule 60 motion regarding such

payments of other professionals likely untimely.  If Webster were

---

[30]  *See also In re Anolik*, 207 B.R. at 40 ("It is
inequitable to order disgorgement of payments made to trade
creditors and other similarly situated parties 'in the ordinary
course of business' of a Chapter 11 case.  'The alternative would
make it impossible for any prudent business person to voluntarily
do business, even on a cash basis, with a chapter 11 debtor.'"
(quoting *Turmail v. Yankee Motor Freight (In re Manwell)*, 62 B.R.
533, 534 (N.D. Ind. 1986))).

[31]  Webster employed various other professionals other than
his law firm.  Except for Lander, those professionals' fees were
paid in full in the case.  The *Motion to Alter*, at 8, lists
payments aggregating $23,230.38 made to three professionals.  In
addition, some claims of Chapter 11 professionals were paid in
full.

to succeed in pursuing disgorgement of amounts paid pursuant to final orders, he and his law firm would be free to file a motion to alter or amend the judgment in favor of The Hartford and the United States Trustee under Fed. R. Bankr. P. 9024 and Fed. R. Civ. P. 60(b)(5) at that time to take into account that such recoveries will lessen the amount needed to be disgorged by Webster and his law firm to achieve a pro rata distribution.

Webster and his law firm were free to request the court to condition the orders for payment of other professionals as being non-final because of the possibility that there might be insufficient funds at the end of the case to pay all Chapter 7 administrative claims in full.  *See In re Lochmiller Indus., Inc.*, 178 B.R. 241, 244-45 (Bankr. S.D. Cal. 1995).  They did not do so.[32]  They ought not be allowed now to seek to lower the disgorgement required of them when they failed to take steps to make clear that all professionals would be subject to disgorgement to the extent necessary to achieve a pro rata distribution under § 726(b); when they have taken no steps to obtain relief from final orders authorizing payment to some professionals; and when they have not taken any other steps to obtain a disgorgement with respect to such payments.

---

[32]  Webster may very well have given such professionals assurances that Webster would not object to their fees being allowed pursuant to final orders.

76

The payments to Webster and his law firm were pursuant to
interim orders under § 331. Such interim payments are always
subject to review at the end of the case. *See Matz*, 197 B.R. at
639-40:

> An award of interim fees by the bankruptcy court under
> § 331 is not final, *Brouwer v. Ancel & Dunlap (In re
> Firstmark Corp.)*, 46 F.3d 653, 657-59 (7th Cir. 1995),
> and is subject to later review by the court, *In re Taxman
> Clothing Co.*, 49 F.3d 310, 312, 314 (7th Cir. 1995)
> ("Remember that all awards of interim compensation are
> tentative, hence reviewable—and revisable—at the end of
> the case."). Thus, courts have uniformly permitted
> trustees and creditors to seek the return of funds paid
> to professionals employed in the bankruptcy proceeding.
> *E.g., United States Trustee v. Johnston*, 189 B.R. 676,
> 677-78 (N.D. Miss. 1995) (holding that attorney's § 331
> interim fee award during Chapter 11 portion of case could
> be subject to disgorgement in later Chapter 7 liquidation
> in order to effectuate priority scheme of § 726(b));
> *Shaia v. Durrette, Irvin, Lemons & Bradshaw, P.C. (In re
> Metropolitan Elec. Supply Corp.)*, 185 B.R. 505, 508-10
> (Bankr. E.D. Va. 1995) (same); *In re Lochmiller Indus.,
> Inc.*, 178 B.R. 241, 251-54 & n.41 (Bankr. S.D. Cal. 1995)
> (same) (collecting cases); *In re Kingston Turf Farms,
> Inc.*, 176 B.R. 308, 310 (Bankr. D.R.I. 1995) (same);
> *Guinee v. Toombs (In re Kearing)*, 170 B.R. 1, 7-8 (Bankr.
> D.D.C. 1994) (same); *see In re Taxman Clothing Co.*, 49
> F.3d at 316 (ordering attorney for trustee to return over
> $70,000 in fees previously awarded under § 331).
> Regardless of whether this authority stems from 11 U.S.C.
> § 105, which empowers the court to "issue any order,
> process or judgment that is necessary or appropriate to
> carry out [the Bankruptcy Code]," *see Metropolitan Elec.
> Supply Corp.*, 185 B.R. at 508-09, or is simply an
> inherent power of the court in its effort to effectuate
> the distribution scheme outlined by § 726(b), *see
> Johnston*, 189 B.R. at 677, it is without cavil that the
> bankruptcy court has the power to disgorge interim
> professional fees.

Webster and his law firm were in the driver's seat in

administering this case, and chose the accountants and special

77

counsel to employ in the case.  They were on notice as
professionals that disgorgement might be necessary if funds were
insufficient to pay Chapter 7 administrative claims in full, *see*
*Matz*, 197 B.R. at 640, and, indeed, were well aware of the
possibility of disgorgement at the end of the case might be
necessary to assure compliance with § 726(b).

Webster's reliance on *In re Anolik* in support of his
argument does not persuade me to the contrary.  There, the United
States Trustee objected to a final report under which Chapter 7
administrative tax claims would not be paid at the same rate as
the professional fees sought by certain professionals that would
be paid in full, and raised at a hearing a request for
disgorgement to achieve a pro rata distribution.  The court
stated:

> Where disgorgement by any party is ordered, such
> disgorgement should not exceed the amount that would be
> required to achieve a pro rata distribution assuming that
> all parties subject to disgorgement were ordered to
> relinquish funds, regardless of whether the court
> actually so ordered. A claimant required to disgorge
> should not suffer disproportionately simply because the
> court equitably waived disgorgement for another
> administrative claimant. Court authorized professionals
> are not second-class service providers, nor does their
> function include the disproportionate subsidization of
> bankruptcy cases.

*In re Anolik*, 207 B.R. at 40 (footnote omitted).  No other court
appears to have approved that cryptic observation, and it is
difficult to understand exactly the point the court was trying to
make.  There were multiple interim awards of compensation to

78

professionals in that case.  The court may very well have been

saying that "all parties subject to disgorgement" meant *all* of

those professionals whose receipt of fees had only been pursuant

to interim orders, and that disgorgement ought not be just from a

few of the professionals whose only payments were interim

payments.  That might be a fair point.  However, here

disgorgement *has* been sought from all of the entities whose

receipt of payments were only pursuant to interim orders.  If,

instead, the court in *Anolik* meant "all parties subject to

disgorgement" to include entities that had received payment

pursuant to final orders, not just interim orders, I disagree

with its observation.  At the end of the case, those entities

whose payments, as interim payments, are still subject to

adjustment, are the entities whose payments must be adjusted to

assure a pro rata distribution has occurred vis-à-vis other

unpaid administrative claimants.  Entities who received payments

pursuant to final orders (or in the ordinary course of business)

are generally viewed as not subject to disgorgement.

     In any event, the *Anolik* decision did not direct

disgorgement of any fees because other issues required

disapproval of the trustee's final report.  The court denied

disapproval of the final report and set a deadline for the filing

of any request for disgorgement.  Accordingly, without an order

addressing the specific calculation of the extent of a required

disgorgement of fees, it is difficult to discern exactly what point the court was making.[33]

XII

THE DISGORGEMENT ORDER WILL NOT ENTITLE THE
SECURED CREDITORS TO REVIVE THEIR CLAIMS AGAINST THE ESTATE

Webster contends that disgorgement of Webster and his law firm may have the unintended consequence that the Secured Creditors may reassert their claims on funds collected by Webster and his law firm under § 506(c) and disgorged to the estate for a pro rata distribution under § 726(b). This contention is barred because it was not raised previously. In any event, it fails on the merits.

The Secured Creditors entered into the *Stipulation* whereby the Secured Creditors released their lien on all funds released to Webster under the *Stipulation*. They already no longer had liens on amounts surcharged under § 506(c) and paid to administrative claimants: if any of those amounts are disgorged by Webster and his law firm, that would not alter the fact that

---

[33] In a footnote, 207 B.R. at 40 n.10, the court criticized a decision holding that Chapter 11 professionals could be required to disgorge fees to the extent necessary to pay Chapter 7 administrative claims. With due respect, that criticism is off the mark because Chapter 7 administrative claims are of a higher priority than Chapter 11 administrative claims, for reasons explained in the decision quoted in that footnote. In any event, this is not a case in which any orders other than final orders were entered regarding Chapter 11 professional fees, and thus disgorgement is not possible as to such Chapter 11 professional fees on the basis that they were interim awards.

80

the funds were not subject to the Secured Creditors' liens.  It would only have an impact on which holders of unsecured administrative claims receive the funds.  How the court distributes the estate's funds, including any funds anyone disgorges to the estate, is no longer a concern of the Secured Creditors.  In any event, as in *Matz*, 197 B.R. at 641, in which a similar argument was rejected, the Secured Creditors have not sought to intervene or made any indication that they will try to recover funds the court orders to be disgorged.

XIII

CONCLUSION

For the aforesaid reasons, it is

ORDERED that Webster's *Motion to Alter or Amend Judgment* (Dkt. No. 1327) is DENIED.

[Signed and dated above.]

Copies to: Recipients of e-notice of orders.

81